**STATE of Tennessee,**

v.

**Tyrone CHALMERS.**

Supreme Court of Tennessee,
at Jackson.

Oct. 5, 2000.

Linda Kaye Garner, Memphis, TN, for appellant, Tyrone Chalmers.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, and Erik William Daab, Assistant Attorney General, for appellee, State of Tennessee.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and WILLIAM M. BARKER, J., joined.

The defendant was convicted of felony murder and especially aggravated robbery. The jury sentenced him to death after finding that the evidence of an aggravating circumstance - that the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person - outweighed evidence of mitigating circumstances beyond a reasonable doubt. The trial judge imposed a sentence of twenty years for the especially aggravated robbery conviction, to run concurrently with the death sentence but consecutively to sentences previously imposed in another case. On direct appeal, the Court of Criminal Appeals affirmed the convictions and sentences. We conclude that the State's introduction of evidence and subsequent argument concerning the specific facts and circumstances of the defendant's prior violent felony convictions do not mandate reversal under *State v. Bigbee*, 885 S.W.2d 797 (Tenn. 1994), that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, and that race is considered when

performing comparative proportionality review to ensure that an aberrant death sentence was not imposed due to the defendant's race. Accordingly, we affirm the Court of Criminal Appeals in all respects.

In this capital case, the defendant, Tyrone Chalmers, was convicted of one count of felony murder and one count of especially aggravated robbery. The jury sentenced him to death after finding that the evidence of an aggravating circumstance—that the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, *see* Tenn.Code Ann. § 39–13–204(i)(2) (Supp.1994),—outweighed evidence of mitigating circumstances beyond a reasonable doubt. The trial judge imposed a sentence of twenty years for the especially aggravated robbery conviction, to run concurrently with the death sentence but consecutively to sentences previously imposed in another case.

On direct appeal, the Court of Criminal Appeals affirmed the convictions and the sentences imposed. The defendant appealed to this Court raising numerous issues. We entered an order designating the following issues for oral argument:[1] (1) whether plain error occurred, requiring reversal of the sentence in light of *State v. Bigbee,* 885 S.W.2d 797 (Tenn.1994), and Tenn.Code Ann. § 39–13–204(c) (Supp. 1998), when the prosecution introduced evidence concerning the facts and circumstances underlying the defendant's prior violent felony convictions and when the prosecution referred to the circumstances of these prior violent felony convictions during argument; (2) whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, and all other issues

mandated by Tenn.Code Ann. § 39–13–206(c)(1) (Supp.1994); and (3) whether and how the factor of race should be considered when performing comparative proportionality review.

We conclude that the State's introduction of evidence and subsequent argument concerning the specific facts and circumstances of the defendant's prior violent felony convictions do not mandate reversal under *Bigbee.* We further conclude that the evidence supports the jury's findings as to aggravating and mitigating circumstances and that the sentence of death was not imposed arbitrarily and is not excessive or disproportionate to the penalty imposed in similar cases. Lastly, we clarify that race is considered when performing comparative proportionality review to ensure that an aberrant death sentence was not imposed due to the defendant's race. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

## FACTUAL BACKGROUND

At approximately 5:00 a.m. on August 20, 1994, the body of the African–American victim, 28–year–old Randy Allen, was discovered lying face down on the sidewalk next to · Netherwood Street in Memphis. His pants and underwear had been pulled down around his ankles, and he had been shot five times. Two of the wounds, one to the head and another to the back, were fatal.

Ten days after the shooting, the 21–year–old African–American defendant admitted to Memphis police that he had killed the victim during a robbery. The defendant stated:

I met up with "Dre" and "Black" on Orleans and So. Parkway near the park. "Black" was driving something like a[sic] Oldsmobile, "Dre" was in the front

1. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument...." Tenn.R.Sup.Ct. 12.2.

passenger seat and I got in the back seat. We were just riding around looking for somebody to rob. I had some kind of automatic rifle, it had a clip in it, black and brown color. "Dre" had a .380 automatic or something, look [sic] black to me. I think "Black" had a shotgun. "Black" was driving down Netherwood, and me and "Dre" jumped out on two boys.[2] We tried to rob them. We made them strip, then I had hit the one that was killed with the rifle and it went off, and I couldn't let the rifle go. Then me and "Dre" jumped in the car and left, with "Black" driving. Then "Black" dropped me and "Dre" off near a house, close to Southside School.

The defendant, who robbed Murphy and the victim of $3.00, estimated that he had fired six times. The defendant concluded his statement by remarking, "I'm sorry it ever happened. If I could go through it again, I wouldn't."

Based on this proof, the jury convicted the defendant of felony murder and especially aggravated robbery.[3]

During the sentencing phase, the State introduced evidence of the defendant's previous convictions for attempted especially aggravated robbery and attempted first degree murder for a criminal episode occurring on the same date as the present offenses. The Deputy Clerk for the Shelby County Criminal Court Clerk's Office testified that, according to the court records, Tyrone Chalmers was convicted of attempted especially aggravated robbery and attempted first degree murder on July 8, 1996, for offenses committed against Joseph Hunter on August 20, 1994. During cross-examination, defense counsel contested the clerk's identification of the defendant, asking, "[Y]ou have no way of knowing whether or not those documents that you have are in fact, belong to [sic ] Tyrone Chalmers, do you? You have no personal knowledge yourself, do you?" Hunter, the victim of those prior crimes, then testified that he was driving home at approximately 2:55 a.m. on August 20, 1994, when the defendant stepped in front of his car, pointed a rifle at him, and told him to "give it up." According to Hunter, the defendant fired approximately fifteen rounds at him as he drove away, striking Hunter in the leg and arm.

The defendant presented the testimony of his mother and sister. His mother testified that the defendant was one of seven children, had graduated from high school, and had never given her any trouble. At the time of these offenses, the defendant was employed and was caring for his mother who suffered from diabetes. The defendant's sister described the defendant as "a very caring person" and her best friend. She conceded that he had been in juvenile court once but claimed that the victim of that offense had "actually committed a crime" against the defendant.

The last witness was the defendant, who testified that only hours before he committed these offenses he had been drinking alcohol and had smoked crack cocaine for the first time. He claimed that he could not remember what happened but did recall that the gun he used belonged to one of the accomplices. He admitted having been in juvenile court but asserted that the only criminal charges he had ever faced were those arising from the events of the early morning hours of August 20, 1994.

---

2. These "two boys" were the victim and his cousin, Marlon Murphy. The defendant was also indicted for the aggravated robbery of Murphy, but the charge was dismissed due to Murphy's unavailability as a witness for the prosecution.

3. We agree with the Court of Criminal Appeals that the evidence is sufficient to support the convictions. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State,* 199 Tenn. 298, 305, 286 S.W.2d 856, 859, *cert. denied,* 352 U.S. 845, 77 S.Ct. 39, 1 L.Ed.2d 49 (1956).

The defendant told the victim's family that he was sorry and expressed his desire to take the victim's place if he could. On cross-examination, the defendant admitted that he tried to rob Hunter before he ever met up with Dre and Black.

Based on this proof, the jury sentenced the defendant to death.

## PROSECUTORIAL MISCONDUCT

As noted above, after introducing evidence at the sentencing hearing that the defendant was previously convicted of the attempted especially aggravated robbery and attempted first degree murder of Joseph Hunter, the State presented Hunter's testimony about the specific facts of those crimes. Later, during argument, the State referred to the circumstances concerning the offenses involving Hunter. The defendant did not object at trial and did not complain on appeal.

█ Generally, this Court will not consider issues not raised by the parties; however, plain error is a proper consideration for an appellate court whether properly assigned or not. *State v. Taylor,* 992 S.W.2d 941, 943–44 (Tenn.1999). Plain error may be recognized pursuant to Tenn. R.Crim.P. 52(b) when a "substantial right" of the accused is affected and consideration of the error is "necessary to do substantial justice." In *Bigbee,* this Court held that it is inappropriate to admit evidence regarding specific facts of the crime resulting in the prior conviction when the prior conviction on its face shows that it involved violence or the threat of violence to the person. *Bigbee,* 885 S.W.2d at 811. This error combined with the prosecutor's improper argument, which among other things emphasized the circumstances of the prior conviction, required reversal of the death sentence in *Bigbee.* *Id.* at 812. In light of *Bigbee,* we asked the parties to address whether plain error requiring reversal occurred in this case.

The defendant asserts that evidence of the underlying facts of the defendant's prior convictions necessarily affected the jury's deliberations and effectively eliminated the option of life imprisonment as a sentence. *See id.* at 811 (citing *State v. Smith,* 755 S.W.2d 757, 767 (Tenn.1988)). The State counters that the evidence was admissible because it was necessary to respond to claims by the defense. *See id.* at 812 (citing *Cozzolino v. State,* 584 S.W.2d 765, 767–68 (Tenn.1979)). The State further contends that, because the evidence was admissible, the argument based upon it was proper.

█ When a prosecutor has engaged in improper conduct, the test for determining whether there is reversible error is "whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *Id.* at 809 (quoting *Harrington v. State,* 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965)). In making this determination, the Court considers: (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *Id.* (citing *State v. Buck,* 670 S.W.2d 600, 609 (Tenn.1984)).

█ We have reviewed the record in this case and conclude that the prosecutor's conduct does not mandate reversal under *Bigbee.* Hunter's testimony was relevant to respond to defense claims contesting identification of the defendant as the perpetrator of the prior offenses about which the clerk testified. *See Cozzolino,* 584 S.W.2d at 768. It was inappropriate, however, to introduce evidence of the facts and circumstances of those prior crimes that was not relevant to the identification issue. The prosecutor could have elicited

testimony from Hunter limited to Hunter's ability to identify the defendant. *Cf. State v. Dyle,* 899 S.W.2d 607, 612 (Tenn.1995) (holding that jury must be instructed that value of identification testimony may depend upon the witness's capacity and opportunity to observe the offender).

As for the argument, this case is distinguishable from *Bigbee.* The argument in *Bigbee* was highly improper for several reasons, including: emphasizing the character of the victim of the prior murder, informing the jury of the life sentence for that offense, implying that the defendant should be sentenced to death as punishment for the prior murder, and appealing to the jury to react out of vengeance. *Bigbee,* 885 S.W.2d at 811–12. The Court held that, although each of these errors might have been harmless standing alone, considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affected the jury's sentencing determination to the defendant's prejudice. *Id.* at 812.

During opening argument at the sentencing phase in this case, the prosecutor did not mention the facts or even the specific convictions involving the Hunter offenses. The prosecutor indicated only that the State would be relying on the aggravating circumstance that the defendant was previously convicted of one or more felonies, other than the present charge, which involved violence to the person. During closing argument, the prosecutor did refer to the circumstances of the Hunter offenses when he stated in pertinent part:

> This man before you has been convicted of a crime that involved violence prior to this particular trial. We not only put on the clerk to show that, we brought the victim to show you the nature of that offense. This is not a violence where somebody gets hit or slapped, pushed or knocked down. This violence involves

an individual, Mr. Hunter, coming home, a man appears on the street, wants to take his car or whatever or his life. And, proceeds to shoot at him fifteen times and hit him two times. He gets away, barely. Less than two hours after that, this particular offense occurs. I submit to you that we have proven beyond a reasonable doubt that the defendant has been convicted of an offense of violence prior to this particular offense.

While it was proper to argue that Hunter's testimony had proven the aggravating circumstance beyond a reasonable doubt, the prosecutor engaged in improper argument by implying that the jury should consider the nature of the violence against the victim in the Hunter offenses. *Cf. id.* at 812 (holding that argument regarding victim of prior offense was improper). However, unlike *Bigbee,* the improper remarks in this case were not extensive. *See also State v. Cauthern,* 967 S.W.2d 726, 737 (Tenn.1998). No curative measures were taken because the defendant failed to object. *See id.* The intent of the prosecutor in introducing Hunter's testimony was not improper in that the prosecutor was responding to defense claims that the evidence of the prior convictions was insufficient with regard to identification of the defendant as the perpetrator. The impropriety was limited to the introduction of the details of the Hunter offenses. Moreover, unlike *Bigbee,* the argument here was improper only in the respect that it implied that the jury should consider the nature of the violence against Hunter. The proof of the aggravating circumstance, even excluding the inadmissible evidence, was considerable, and the mitigating evidence was slight. The inadmissible evidence and the improper argument, considered cumulatively, did not affect the jury's sentencing determination to the defendant's prejudice. *See Bigbee,* 885 S.W.2d at 812. Any constitutional error was harmless beyond a reasonable doubt. *See*

*id.* at 809; *see also State v. Howell,* 868 S.W.2d 238, 260 (Tenn.1993). Because we find no reversible error, we need not address the State's assertion that reversal is not warranted in light of Tenn.Code Ann. § 39–13–204(c) (Supp.1998).[4]

## COMPARATIVE PROPORTIONALITY REVIEW

■■■ The defendant contends that his sentence is disproportionate to the penalty imposed in similar cases. Pursuant to Tenn.Code Ann. § 39–13–206(c)(1)(D) (Supp.1994), the Court conducts a comparative proportionality review to ensure that no aberrant death sentence is affirmed. *State v. Blanton,* 975 S.W.2d 269, 281 (Tenn.1998). In performing our comparative proportionality function, we have consistently employed the precedent-seeking approach, which compares the case at issue with other cases in which defendants were convicted of the same or similar crimes. *State v. Bland,* 958 S.W.2d 651, 664 (Tenn.1997). Factors relevant to the process of identification and comparison of similar cases include: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. *Id.* at 667. Factors relevant to comparison of the characteristics of defendants include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. *Id.*

The present case is similar to numerous cases in which the sentence of death was affirmed by this Court. We have reviewed and upheld the death sentence on direct appeal in the following cases involving the shooting of a randomly chosen victim during a robbery: *State v. Smith,* 993 S.W.2d 6 (Tenn.1999); *State v. Burns,* 979 S.W.2d 276 (Tenn.1998); *State v. Howell,* 868 S.W.2d 238 (Tenn.1993); *State v. Boyd,* 797 S.W.2d 589 (Tenn.1990); *State v. Johnson,* 762 S.W.2d 110 (Tenn.1988); *State v. Bobo,* 727 S.W.2d 945 (Tenn.1987); *State v. Sparks,* 727 S.W.2d 480 (Tenn. 1987); *State v. Harries,* 657 S.W.2d 414 (Tenn.1983); *State v. Coleman,* 619 S.W.2d 112 (Tenn.1981). In addition to *Smith, supra,* other cases in which we have upheld the death sentence based on the sole aggravating circumstance of a prior violent felony conviction include *State v. Adkins,* 725 S.W.2d 660 (Tenn.1987), and *State v. Goad,* 707 S.W.2d 846 (Tenn.1986).

■■■ We have considered the defendant's argument that he should have received a life sentence because he committed an act totally alien to his character

---

4. After sentencing in this case, Tenn.Code Ann. § 39–13–204(c) was amended to add the following language:

   In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.

   Tenn.Code Ann. § 39–13–204(c) (Supp.1998).

while under the influence of drugs. To the contrary, the defendant's own witnesses established that he had been in juvenile court on another matter before the incidents of August 20, 1994. The record supports the jury's finding that the aggravating circumstance of prior violent felony convictions outweighed any mitigating circumstances beyond a reasonable doubt. Based upon the strength of this aggravating circumstance and the similarity of this case to other cases in which the death penalty was imposed, we conclude that the death sentence in this case is not disproportionate.

## RACE AS A FACTOR IN PROPORTIONALITY ANALYSIS

■ The defendant does not allege and there is no indication that the jury's sentencing determination in this case was based upon race. Nevertheless, the State suggests a need for clarification regarding the use of race in proportionality analysis. In *Bland,* the Court listed race, along with age and gender, as one of the factors to be considered when comparing characteristics of defendants. 958 S.W.2d at 667. In applying the *Bland* factors to the defendant in *State v. Pike,* 978 S.W.2d 904 (Tenn.1998), the Court noted that "[w]hile Pike is only the second woman to receive the death sentence in Tennessee, there is absolutely no indication that the jury's imposition of the death sentence was motivated by or based upon Pike's gender." *Id.* at 919. Likewise, race is considered when performing comparative proportionality review to ensure that an aberrant death sentence was not imposed due to the defendant's race.

## CONCLUSION

In accordance with the mandate of Tenn.Code Ann. § 39–13–206(c)(1) (Supp. 1994) and the principles adopted in prior decisions of this Court, we have considered the entire record in this case and conclude that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt, and that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. We have carefully reviewed all of the issues raised by the defendant and the issue we raised regarding the State's introduction of evidence and subsequent argument concerning the specific facts and circumstances of the defendant's prior violent felony convictions, and we have determined that these issues are without merit or do not require reversal. With respect to issues not specifically addressed in this opinion, we affirm the decision of the Court of Criminal Appeals, authored by Judge Gary R. Wade and joined in by Judges Thomas T. Woodall and John Everett Williams. Relevant portions of that opinion are attached as an appendix to this opinion. The defendant's sentence of death is affirmed and shall be carried out on the 9th day of February, 2001, unless otherwise ordered by this Court or proper authority.

It appearing from the record that the appellant is indigent, costs of this appeal are assessed to the State of Tennessee.

ADOLPHO A. BIRCH, Jr., J., filed a concurring and dissenting opinion.

FRANK F. DROWOTA, III, J., not participating.

ADOLPHO A. BIRCH, Jr., J., concurring and dissenting.

The comparative proportionality review is intended to guard against the arbitrary

imposition of the death penalty, and I agree with the majority that race is a factor which must be considered if proportionality review is to accomplish its purpose. The majority opinion, however, fails to provide any guidance as to how race is to be considered in that analysis. Without such guidance, the objective of comparative proportionality review is lost. Moreover, there is evidence that the pool of capital cases examined in proportionality reviews conducted by this Court may be "race-tainted." [1] If this is so, comparing a death-sentenced defendant's race to the race of defendants in prior capital cases does nothing to prevent the arbitrary imposition of capital punishment.

Thus, the lack of guidance, the use of a pool which is probably "race-tainted," and the subjective manner in which these reviews are conducted make their efficacy questionable. Because of these views, I cannot agree to impose the death penalty in this case and therefore dissent.

## I

Before examining the role of race in comparative proportionality review, its impact upon capital punishment in general must be addressed. Several commentators have questioned whether race improperly influences the decision of which defendants should be executed.

A nationwide review performed by the United States General Accounting Office (USGAO) of more than two dozen studies on death sentencing found that "[i]n 82 percent of the studies, race of victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e., those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks." United States General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* at 5 (Feb.1990) *reprinted in* 136 Cong. Rec. S6889–90 (daily ed. May 24, 1990). Additionally, the USGAO's review revealed that "more than half of the studies found that the race of the defendant influenced the likelihood of being charged with a capital crime or receiving the death penalty." *Id.*[2]

Perhaps the most widely cited analysis of this issue in the context of a case is found in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). The case arose in Georgia, and McCleskey offered statistical evidence showing that the death penalty in Georgia was more likely to be imposed upon Afro American defendants, particularly when the victim was Caucasian. *Id.* at 286–87, 107 S.Ct. at 1764–65(discussing D. Baldus, C. Pulaski, & G. Woodworth, Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience, 74 J.Crim. L. & Criminology 661 (1983)). Although a bare majority of the Court upheld McCleskey's conviction, Justice Brennan pointed out in dissent that McCleskey's statistics raised serious questions about the fairness of the death penalty:

> At some point in this case, Warren McCleskey doubtless asked his lawyer

1. "Race-tainted" is used to describe those cases in which racial prejudice has influenced either the prosecutor's decision to seek the death penalty or the jury's decision to impose a death sentence.

2. The USGAO conceded that the evidence of a connection between the defendant's race and the death penalty was "equivocal" in comparison to the connection associated with the victim's race. This is significant because the victim in the pending case was Afro American. Evidence that the victim's race improperly influences capital punishment is relevant here, however, because such evidence would tend to affect the reliability of comparative proportionality review in *any* case where race is a factor. If the pool of cases upon which we rely for comparative proportionality review is race-tainted, then considering a defendant's race in comparison to that pool lends no protection against racial bias in capital punishment.

whether a jury was likely to sentence him to die. A candid reply to this question would have been disturbing. First, counsel would have to tell McCleskey that few of the details of the crime or of McCleskey's past criminal conduct were more important than the fact that his victim was white.... [F]rankness would compel the disclosure that it was more likely than not that the race of McCleskey's victim would determine whether he received a death sentence: 6 of every 11 defendants convicted of killing a white person would not have received the death penalty if their victims had been black, while, among defendants with aggravating and mitigating factors comparable to McCleskey's, 20 of every 34 would not have been sentenced to die if their victims had been black. Finally, the assessment would not be complete without the information that cases involving black defendants and white victims are more likely to result in a death sentence than cases featuring any other racial combination of defendant and victim. The story could be told in a variety of ways, but McCleskey could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*Id.* at 321, 107 S.Ct. 1756 (Brennan, J., dissenting) (citations omitted). More recently, in *State v. Harvey,* Justice Handler of the New Jersey Supreme Court stated in dissent that "the evidence that prosecutors and juries are significantly more likely to charge with and sentence to death black defendants killing white victims, is overwhelming." 159 N.J. 277, 731 A.2d 1121, 1194 (1999). While a complete review of the evidence linking race and capital punishment is beyond the scope of this opinion, the overwhelming conclusion is that "[e]ven under the most sophisticated death penalty statutes, race continues to play a major role in determining who shall live and who shall die." *Callins v. Collins,* 510

U.S. 1141, 114 S.Ct. 1127, 1135, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting).

## II

Because of the final, irrevocable nature of the death penalty, we must be cautious to insure that its imposition is not tainted by racial prejudice. *Cf. State v. Cobb,* 251 Conn. 285, 743 A.2d 1, 136 (1999) (Berdon, J., dissenting) ("When death is the consequence there is no margin for error."). Such caution mandates that Tennessee impose reliable safeguards to prevent racial discrimination from infecting the capital sentencing protocol and its appellate review. Until this is done, we cannot be certain that the death penalty is being imposed in a fair and constitutional manner. Unfortunately, the majority's analysis of proportionality review in the case before us, in my view, fails to provide the necessary safeguards against the improper consideration of race in the imposition of capital punishment.

The majority opinion devotes but a single paragraph to analyzing the role of race in comparative proportionality review. Under the circumstances, this analysis falls far short, in my view, of providing the criteria necessary to safeguard against the improper consideration of race in the imposition of capital punishment. The majority states that "race is considered when performing comparative proportionality review to ensure that an aberrant death sentence was not imposed due to the defendant's race." Unfortunately, the opinion fails to suggest how a reviewing court should determine whether a death sentence was imposed "due to" race. As discussed above, numerous studies have indicated that racial bias may play a significant role in determining which defendants receive the death penalty. Without some assurance that Tennessee's death penalty cases have remained free from such bias, it is unclear how compara-

tive proportionality review could ever ensure that race-motivated death sentencing does not occur. If a defendant's sentence is compared to a pool of cases which are similarly race-tainted, the reviewing court is without a benchmark by which to determine whether the defendant's sentence is "aberrant ."

Furthermore, the majority does not clarify whose race should be considered in comparative proportionality review-the defendant's, the victim's, or both. In *State v. Bland,* the Court addressed the list of factors to be considered in proportionality review. 958 S.W.2d 651, 667 (Tenn.1997). In addressing the characteristics of defendants, the *Bland* Court listed "age, race, and gender" as factors to be considered. However, in addressing the characteristics of victims, the Court listed only "the similarity of the victims' circumstances including age, physical and mental conditions." *Id.* Although the *Bland* Court did recognize that its list was "by no means ... exhaustive," *see id.,* the Tennessee Supreme Court has never clearly stated that the victim's race should be considered in comparative proportionality review. Given the vast array of evidence indicating that racial disparities in death sentencing are at their greatest in cases where an Afro–American defendant has killed a Caucasian person, we should clearly establish that the victim's race and the defendant's race bear equal significance in comparative proportionality review.

## III

In addition to the difficulties inherent in the comparison of race in comparative proportionality review, the manner in which proportionality review itself is conducted raises significant concerns. In order to meet constitutional requirements, a protocol of capital punishment must provide a "meaningful basis for distinguishing the

few cases in which [the death penalty] is imposed from the many cases in which it is not." *Bland,* 958 S.W.2d at 675 (Tenn. 1997) (Reid, J., concurring and dissenting) citing *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring). Although comparative proportionality review itself is not constitutionally required,[3] the Tennessee legislature has chosen comparative proportionality review as a means of providing the "meaningful basis" required by the constitution. *See Bland,* 958 S.W.2d at 675 (Reid, J., concurring and dissenting). Unfortunately, the manner in which we conduct our comparative proportionality review fails to accomplish this objective. The review procedures are ineffective for three reasons: the "test" we employ is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the "pool" of cases which are reviewed for proportionality is too small.

The proportionality review procedures employed by the Court make it exceedingly difficult for defendants to show that their death sentences are disproportionate. In *State v. Bland,* the Court created a narrow "totality of the circumstances" approach for determining whether a defendant's death sentence is disproportionate. 958 S.W.2d at 665. The Court first outlined the test to be used in comparative proportionality review: "If the case, taken as a whole, is *plainly lacking* in circumstances consistent with those in similar cases in which the death penalty is imposed, the sentence of death in the case being reviewed is disproportionate." *Id.* (emphasis added). The Court then stressed that it would not find a death sentence to be disproportionate merely because the defendant could point to comparable cases where the death penalty was not imposed, because "[e]ven if a defendant receives a death sentence when the

**3.** *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104     S.Ct. 871, 79 L.Ed.2d 29 (1984).

circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence." *Id.* Furthermore, even if a defendant could show that other defendants received life sentences for similar crimes and the reviewing court could *not* discern some basis for the difference in treatment, this would not necessarily spare the defendant. As stated by the *Bland* Court, "where there is no discernible basis for the difference in sentencing, the death sentence is not necessarily disproportionate. This Court is not required to determine that a sentence less than death was never imposed in a case with similar characteristics." *Id.*

Because our current comparative proportionality review system lacks objective standards, comparative proportionality analysis seems to be little more than a "rubber stamp" to affirm whatever decision the jury reaches at the trial level. Justice Handler of the New Jersey Supreme Court, criticizing New Jersey's protocol, a comparative proportionality review protocol similar to Tennessee's, described such reviews as "an inherently subjective exercise that 'invokes culpability assessments by the court, which are, essentially, moral judgments'.... [A] death sentence can always be justified given the level of individuality afforded the analysis." *State v. Harvey*, 159 N.J. 277, 731 A.2d 1121, 1179 (1999) (Handler, J., dissenting) (quoting *State v. Loftin*, 157 N.J. 253, 724 A.2d 129 (1999) (Handler, J., dissenting)). Without some objective standard to guide reviewing courts, "proportionality" becomes nothing more than a statement that

the reviewing court was able to describe the case before it in terms comparable to other capital cases. In the pending case, the range of similar cases was broadly defined to encompass "cases involving the shooting of a randomly chosen victim during a robbery." Had the Court chosen different factors and defined the comparable cases more narrowly, it is possible that the number of "similar" cases in which the death penalty had been upheld would be much smaller.

Furthermore, Tennessee's system of comparative proportionality review does not consider all prior cases in which the death penalty could have been imposed. Therefore, it fails to protect defendants from arbitrary prosecutorial decisions. In *Bland*, the Court determined that courts applying comparative proportionality review should consider only "those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death by electrocution." *Bland*, 958 S.W.2d at 666. Thus, the large segment of first degree murder cases in which the prosecutor chose not to seek the death penalty are excluded from comparative proportionality review. As I stated in my dissent in *Bland*, "[d]efendants are often convicted of first degree murder after a trial in which the prosecution, for whatever reason, did not seek the death penalty.... However, cases in which the death penalty is not sought are equally relevant to proportionality as cases in which the death penalty is sought." *Id.* at 679. Unless we compare all cases in which the death penalty could have been imposed, a reliable finding of proportionality is impossible.[4]

4. The *Bland* Court implied that a comparative proportionality review which encompassed non-death penalty cases would entail an impermissible review of prosecutorial discretion. *See id.* n. 17 (citing *State v. Whitfield*, 837 S.W.2d 503, 515 (Mo.1992)). However, a primary purpose of comparative proportional-

ity review is to "guard against the capricious or random imposition of the death penalty." *Id.* at 665. If the evidence were to show that the death penalty had been arbitrarily applied because prosecutors treated similar cases differently for no rational reason, such random choices between life and death should not be

Despite the weaknesses of comparative proportionality review, we continue to insist that courts, prosecutors, and defense counsel expend time and resources conducting these reviews, just as we continue to insist that we are protecting defendants from the unfair imposition of the death penalty. In his concurrence and dissent in *Bland*, Justice Reid noted that not one of the 116 death sentences the Court had reviewed at the time had been found disproportionate, and he cautiously noted that "whether the [comparative proportionality review] procedure ... will produce more than the routine affirmation of jury verdicts accompanied by praise of the procedure remains to be seen." *Bland*, 958 S.W.2d at 675 n. 1. In the fourteen capital cases the Supreme Court has reviewed for proportionality since *Bland*, the string of affirmations remains unbroken by even a single reversal.[5] In reviewing a similar comparative proportionality review procedure in Connecticut, Justice Peters of the Connecticut Supreme Court stated that "the search for an [aberrant death sentence] is the pursuit of a chimera," and she concluded that defendants facing the death penalty did not "receive even a scintilla of protection from proportionality review." *State v. Cobb*, 251 Conn. 285, 743 A.2d 1, 133 (1999) (Peters, J., concurring). Because of the weaknesses inherent in Tennessee's comparative proportionality review procedure, the same could be said of comparative proportionality review in Tennessee.

### IV

For the foregoing reasons, in my view, the majority's opinion fails to protect defendants from the arbitrary or disproportionate imposition of the death penalty. Although I agree that comparative proportionality review is essential to ensure that the death penalty is constitutionally applied, I am unconvinced that the current system adequately fulfills this purpose. Furthermore, while I agree that race must be considered a factor if comparative proportionality review is to be effective, the majority's cursory treatment of this issue fails to specify how proportionality analysis should be conducted in order to ensure that racial bias is eliminated from our capital sentencing system. Until these flaws are addressed and corrected, I cannot agree that the defendant's death sentence in this case has been fairly and proportionately imposed in keeping with the constitution. Therefore, although I concur in the majority's decision to affirm the defendant's conviction, I respectfully dissent from its decision to impose the death penalty in this case.

### APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

### IN THE TENNESSEE COURT OF CRIMINAL APPEALS AT JACKSON DECEMBER 1998 SESSION

State of Tennessee, Appellee,

v.

Tyrone Chalmers, Appellant.

accepted by this Court any more than if the same result had been created by aberrant juries.

5. *See Keough v. State*, 121 S.Ct. 205 (2000); *State v. Hall*, 8 S.W.3d 593 (Tenn.1999); *State v. Middlebrooks*, 995 S.W.2d 550 (Tenn.1999); *State v. Smith*, 993 S.W.2d 6 (Tenn.1999); *State v. Burns*, 979 S.W.2d 276 (Tenn.1998); *State v. Pike*, 978 S.W.2d 904 (Tenn.1998); *State v. Nesbit*, 978 S.W.2d 872 (Tenn.1998); *State v. Hall*, 976 S.W.2d 121 (Tenn.1998); *State v. Vann*, 976 S.W.2d 93 (Tenn.1998); *State v. Blanton*, 975 S.W.2d 269 (Tenn.1998); *State v. Cribbs*, 967 S.W.2d 773 (Tenn.1998); *State v. Cauthern*, 967 S.W.2d 726 (Tenn. 1998); *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997); *State v. Mann*, 959 S.W.2d 503 (Tenn. 1997).

C.C.A. No. 02C01-9711-CC-00449

SHELBY COUNTY (No. Below) The Honorable Carolyn Wade Blackett (ESPECIALLY AGGRAVATED ROBBERY and FELONY MURDER - DEATH PENALTY)

OPINION FILED: March 15, 1999.

AFFIRMED

GARY R. WADE, Presiding Judge.

## OPINION

**[Sections on Background and Sufficiency of the Evidence Deleted]**

## II

Next, the defendant contends that the trial court erroneously admitted a photograph of the victim as he was found on the street. The photo depicts the victim lying face down. His pants had been lowered to ankle level. The defendant insists that "the photo in question was void of probative weight and packed full of impermissible and inflammatory content."

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn.R.Evid. 401. Rule 403, Tenn. R.Evid., however, provides that relevant evidence may be excluded in certain situations:

> Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Simply because evidence is prejudicial does not mean the evidence must be excluded as a matter of law. *See State v. Gentry,* 881 S.W.2d 1, 6 (Tenn.Crim.App. 1993). Courts must still determine the relevance of the photograph and weigh its probative value against any undue prejudice.

In *State v. Banks,* 564 S.W.2d 947, 951 (Tenn.1978), our supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim. . . ." In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge. The "value of photographs as evidence, . . . their accuracy and clarity . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors. *Id.*

The admissibility of relevant photographs of the victim is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. *Banks,* 564 S.W.2d at 949. *See also State v. Bigbee,* 885 S.W.2d 797, 807 (Tenn.1994); *State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn. 1993).

The photograph at issue is clearly relevant. The state had to prove, notwithstanding the defendant's confession, that the defendant killed the victim during an attempt to commit an especially aggravated robbery. The photograph suggests that the victim was shot in the back causing him to fall face down. As the state argued at trial, the victim's pants could have been dropped to his ankles to prevent him from fleeing or otherwise resisting during the robbery. Although a portion of the body is nude, neither the wounds nor blood are highlighted in the photo at issue. The photograph is particularly relevant as

corroborative of the details of the incriminating statement made by the defendant. In our assessment, the probative value outweighs any undue prejudicial effect.

As a collateral claim, the defendant also contends that the admission of the photograph into evidence violated his right to due process and his right to be free from cruel and unusual punishment. *See* U.S. Const. amend. VIII, XIV. We do not agree. The photograph is not so inflammatory as to cause the jury to convict out of passion or caprice. The facts, in this context, do not form any basis for a claim of cruel or unusual punishment.

### III

The defendant also claims the statement he gave to the police was the result of coercion and force and should not have been admitted at trial. We disagree.

At the hearing on the motion to suppress, Lt. James L. Nichols of the Memphis Police Department testified that he assisted Sergeant D.E. Woods in the August 20, 1994, interrogation of the defendant. Lt. Nichols recalled that the defendant was informed of his Miranda rights before any questions were submitted. According to Lt. Nichols, the defendant understood his rights and wished to make a statement to the police. Lt. Nichols stated that neither he nor Sergeant Woods coerced or threatened the defendant in any way and never promised him anything in exchange for his statement. He described the statement as freely and voluntarily given. The statement, which was made during a forty-five minute interview, was reduced to writing and signed by the defendant. Lt. Nichols, who described the defendant as reasonably intelligent, did not remember whether the defendant signed a separate "advice of rights" document.

Elise Flowers, who transcribed the statement as Lt. Nichols and Sgt. Woods conducted the interview, testified that the defendant was advised of his rights before the interrogation. She testified that the defendant acknowledged his rights, agreed to talk, and was not threatened, coerced, or promised anything in return for his answers. Ms. Flowers did not remember whether the defendant had singed a separate "advice of rights" form or whether he had read the transcript of the interview in her presence.

At the suppression hearing, the defendant claimed that he had been questioned previously by the officers and had informed them that he did not want to give a statement. He asserted that he had not been advised of his rights and did not understand why he was being forced to give a statement. The defendant testified that Sgt. Woods and two other officers struck him on the head several times with a telephone book. The defendant alleged that the officers forced the confession and written transcript. He insists that Ms. Flowers gave false testimony.

On cross-examination, the defendant admitted that he was in custody at that time on an attempted robbery and attempted murder charge stemming from the separate incident which had occurred earlier on the same night as the murder. The defendant, who had pled guilty to those charges prior to this hearing, stated that he gave a statement relating to the earlier incident at about the same time he gave the statement in this case. The defendant testified that he was beaten and forced to talk during both interviews. He conceded, however, that he failed to bring these claims to the attention of the trial judge who accepted the guilty pleas to attempted murder and attempted especially aggravated robbery. When asked during the submission hearing, the defendant asserted that he had voluntarily given the statement without being coerced or threatened. He explained this omission on his being "stressed out" because his mother was

having health problems. Interestingly, the defendant acknowledged that he had been advised of his rights before he gave a statement on the prior charges and that he understood and voluntarily waived those rights.

Sgt. Woods denied having physically or verbally abused the defendant at any time before or during the interview on the felony murder. Sgt. Woods testified that he advised the defendant of his rights, did not coerce the defendant, and did not suggest what answers the defendant should provide.

To support his argument that the trial court erred in denying his motion, the defendant places primary emphasis on his testimony that he was beaten with a telephone book and that the initial "advice of rights" document has been lost or misplaced.

It is the duty of the trial judge to determine the voluntariness and the admissibility of the defendant's pretrial statement. *State v. Pursley*, 550 S.W.2d 949, 952 (Tenn.1977). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. In addition, "the party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* The trial judge did not make explicit findings of fact in this case, simply stating, "At this time, based on the testimony and based on the Court's review of the statements and other evidence, the

Motion to Suppress by the defendant will be denied at this time." Nevertheless, the denial of the motion implies a determination that the defendant did voluntarily and knowingly waive his rights. *See House v. State*, 592 S.W.2d 902, 904 (Tenn.Crim. App.1979).

In *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise defendants of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn.1992). The Fifth Amendment right against self-incrimination may be waived only if done so voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602. In order for an accused to effect a waiver, he must be adequately apprised of his right to remain silent and the consequence of deciding to abandon it. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn.1994). In determining whether the confession was voluntary and knowing, the totality of the circumstances must be examined. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn.1997).

In our view, the trial court properly denied the motion. Implicit in the conclusion reached by the trial court is that the testimony of the three witnesses for the state was more credible than that of the defendant. While there is no separate "advice of rights" form, both the written statement and the testimony at the suppression hearing specifically demonstrate that the defendant was advised of and waived his rights before talking to police.

"The law does not require a written waiver," as long as the record demonstrates the defendant was advised of his rights and did, in fact, waive them. *State v. Mann*, 959 S.W.2d 503, 530 (Tenn.1997). *See also State v. Elrod*, 721 S.W.2d 820, 823 (Tenn.Crim.App.1986) (absence of written waiver does not per se require suppression if waiver can be found from the surrounding circumstances). The evidence simply does not preponderate against the trial court's ruling. *See Odom*, 928 S.W.2d at 23. Thus, the issue is without merit.

[Section IV. Sufficiency of the aggravating evidence against mitigating evidence, review of death sentence under Tenn.Code Ann. § 39–13–206(c) and proportionality review—Deleted]

Accordingly, the judgment of the trial court is affirmed.

CONCUR:

THOMAS T. WOODALL, JUDGE

JOHN EVERETT WILLIAMS, JUDGE