IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2022

**CASEY COLBERT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-07785    James M. Lammey, Judge**

_____

**No. W2021-00778-CCA-R3-PC**
_____

The Petitioner, Casey Colbert, appeals the denial of post-conviction relief from his convictions for first degree felony murder and attempted aggravated robbery, alleging that he received ineffective assistance of counsel and that the State committed prosecutorial misconduct depriving him of his right to a fair trial. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Casey Colbert, Whiteville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The charges in this case arose from a May 7, 2009 robbery that resulted in the fatal shooting of victim, Ben Walker. In December 2009, a Shelby County Grand Jury jointly indicted the Petitioner and his co-defendant, William Peete, under a theory of criminal responsibility, for first degree felony murder, attempted aggravated robbery, and employing of a firearm during the commission of a dangerous felony. State v. Casey Colbert, No. W2012-00099-CCA-R3-CD, 2013 WL 3128698, at *1 (Tenn. Crim. App. June 18, 2013), perm. app. denied (Tenn. Nov. 13, 2013). In August 2011, the Petitioner was indicted for two counts of bribing a witness and two counts of coercing a witness in connection with the charges in the 2009 indictment. Id. Over the defense's objection, the trial court consolidated the charges from the 2009 and 2011 indictments into a single trial

for the Petitioner. Id. At the conclusion of trial, the jury found the Petitioner guilty as charged of first degree felony murder, attempted aggravated robbery, employing a firearm during the commission of a dangerous felony, two counts of bribing a witness, and two counts of coercing a witness. Id. The trial court imposed an effective sentence of life imprisonment plus twenty-two years. Id. A detailed summary of the evidence presented at the Petitioner's trial can be found in this court's opinion on direct appeal. Casey Colbert, 2013 WL 3128698, at *1-13.

On direct appeal, the Petitioner argued that the evidence was insufficient to support his murder conviction, that the trial court erred in consolidating the bribery and coercion offenses with the other offenses, that the prosecutor engaged in improper argument, that the cumulative errors entitled him to a new trial, and that his sentence was excessive. Id. at *1. This court held that while the trial court erred in consolidating the Petitioner's indictments into a single trial, this error was harmless as to the Petitioner's convictions for first degree felony murder and attempted aggravated robbery and affirmed those convictions. Id. However, because the error regarding consolidation was not harmless as to the Petitioner's two convictions for bribing a witness and his two convictions for coercing a witness, it reversed those convictions and remanded those charges for further proceedings. Id. In addition, the court held that because the Petitioner had not employed a firearm during the commission of a "dangerous felony," as that term was defined by statute, it reversed the Petitioner's conviction for the firearm offense. Id. Finally, the court remanded the case for a new sentencing hearing for the Petitioner's convictions for first degree felony murder and attempted aggravated robbery. Id. The Petitioner subsequently entered guilty pleas to the two counts of bribing a witness and the two counts of coercing a witness. See State v. Casey Colbert, No. W2017-01998-CCA-R3-CD, 2018 WL 4960225, at *1 (Tenn. Crim. App. Oct. 15, 2018), perm. app. denied (Tenn. Feb. 25, 2019). Following a sentencing hearing, the trial court merged the two bribery convictions into a single conviction for bribery and merged the two coercion convictions into a single conviction for coercion before imposing a six-year sentence for bribery and a four-year sentence for coercion served consecutively for an effective sentence of ten years. Id. These sentences were affirmed on appeal. Id.

In 2014, the Petitioner timely filed a pro se petition for post-conviction relief and then filed several amended petitions, alleging in pertinent part that trial counsel provided ineffective assistance in failing to conduct a reasonable investigation, in failing to call various witnesses, in failing to impeach and thoroughly cross-examine the State's witnesses, in failing to present viable alibi and third-party perpetrator theories of defense, in failing to object to co-defendant William Peete's surprise testimony placing the Petitioner at the scene when a notice of alibi had been given, in failing to object to the State's leading questioning of its witnesses, and in failing to object to improper closing arguments by the State at trial. Casey Colbert v. State, 2020 WL 2394141, at *1. The

Petitioner also raised allegations of newly discovered evidence and prosecutorial misconduct. Id.

The post-conviction court conducted an evidentiary hearing, and entered an order denying relief, stating that it had "elected to make [its] findings of fact and conclusions of law orally" and that "[a] transcript of the hearing and oral ruling [was] incorporated by reference . . . ." The Petitioner timely appealed, and this court reversed the judgment of the post-conviction court and remanded the case after concluding that the post-conviction court failed to make sufficient findings of fact and conclusions of law in its order denying relief. Id. at *16. In our opinion on remand, this court engaged in an extensive factual recitation of the testimony adduced at the post-conviction evidentiary hearing, which we rely upon and incorporate by reference herein, Casey Colbert v. State, 2020 WL 2394141 at *5-11. On remand, the post-conviction court entered a supplemental order, provided extensive factual findings and conclusions of law, and denied relief. Thereafter, the Petitioner filed a timely notice of appeal. The case is now properly before this court for review.

## ANALYSIS

The Petitioner argues that trial counsel provided ineffective assistance on multiple grounds and that the State committed prosecutorial misconduct depriving him of his right to a fair trial. In response, the State contends that the Petitioner failed to show that trial counsel was ineffective, and it asserts that the Petitioner waived his claims regarding prosecutorial misconduct. We conclude that the Petitioner is not entitled to post-conviction relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

**I. Ineffective Assistance of Counsel.** The Petitioner contends that trial counsel provided ineffective assistance. Specifically, he asserts that trial counsel failed to object and request a mistrial based on the State's violations of Rule 12.1(b) and Rule 16, failed to conduct a reasonable investigation, failed to call various witnesses, failed to thoroughly cross-examine and impeach the State's witnesses, failed to present an alibi defense or third-

party perpetrator defense, failed to object and request a mistrial after the State made improper comments during closing, and failed to object and request a mistrial after the State asked leading questions of its witness.[1]  The Petitioner also asserts that he is entitled to relief based on the cumulative effect of trial counsel's errors.

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact.  Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)).  A post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them.  Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)).  "Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence."  Mobley, 397 S.W.3d at 80 (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).  However, we review a post-conviction court's application of the law to its factual findings de novo without a presumption of correctness.  Id. (citing Grindstaff, 297 S.W.3d at 216; Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution.  U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance prejudiced the defense.  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984).  A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms."  Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)).  Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  Id. at 370 (quoting Strickland, 466 U.S. at 694).  "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim."  Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S.

---

[1] We have reordered the Petitioner's issues for clarity.

at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369). Nevertheless, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House, 44 S.W.3d at 515 (quoting Goad, 938 S.W.2d at 369).

**Failure to Object and Request a Mistrial in Response to William Peete's Testimony.** The Petitioner argues that trial counsel was ineffective in failing "to object to [co-defendant] William Peete's eye-witness testimony and [in failing to] request the trial court to declare a mistrial." He asserts that he filed a motion for discovery, a motion for notice of the State's intention to use evidence at trial, and a notice of alibi and that trial counsel should have objected pursuant to Tennessee Rule of Criminal Procedure 12.1(b) and Rule 16 when the State failed to disclose co-defendant Peete's eye-witness testimony before or during trial. The Petitioner claims that the State's intent was to "unfairly su[r]prise the defense." He also asserts that the State's violation of these rules "became especially egregious" after trial counsel argued in his opening statement, "The proof in this case is going to show that there was no one [who] could identify the person there that night at 10:20 [who] robbed or tried to rob [the victim]."

The Advisory Commission Comment to Rule 16 notes that while Rules 12.1 and 12.2 are not "technically discovery rules," they are closely related to Rule 16. "The statements of a codefendant discoverable by the codefendant are likewise made discoverable by the defendant, if the codefendant and the defendant are scheduled to be tried jointly. Such statements of a codefendant may be reviewed to determine whether or not a severance under Rule 14(c) need be sought." A Rule 16 discovery violation does not necessarily require the exclusion of evidence and focuses primarily on actual prejudice to the aggrieved party. State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981) (noting that "evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and the prejudice cannot be otherwise eradicated. . . . Rules 12 and 16, as well as other Rules of Criminal Procedure, were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence"). The Petitioner and the co-defendant were not jointly tried. Nevertheless, as the Petitioner's arguments under both rules appear to be the same, our analysis under Rule 12 applies equally to the Petitioner's Rule 16 claims.

At trial, William Peete, the co-defendant, identified the Petitioner as the shooter and testified, in relevant part, as described in our direct appeal opinion, as follows:

Peete stated that [on the night of the offense] the [Petitioner] told him "to get the fuck out of his way." The [Petitioner] raised his gun, which he was holding in his right hand, and pulled the slide back to put a bullet in the chamber. The [Petitioner] pointed the gun at Peete and pushed him out of the way. Fearing that he would be shot, Peete stepped away.

Peete started toward the main house and saw a "flash." Thompson ran up to him. Peete looked toward the truck and saw the victim come out of the passenger side. Peete saw the [Petitioner] come out of the driver's side door, saw the [Petitioner] chase the victim, saw the victim fall, and saw the [Petitioner] "going in [the victim's] pockets." Peete did not see where Parker went. Peete clarified that he could see the [Petitioner's] face as the [Petitioner] was going through the victim's pockets. Peete then saw the Petitioner "leave the scene." Peete testified that the [Petitioner] "left and ran toward the railroad track." Peete did not see the [Petitioner] again that night.

Subsequently, Peete gave a statement to the police. He testified that his statement to the police was not consistent with his testimony. He testified, "I told them it was a masked man came to the truck and robbed him, pulled a gun on us." Peete explained that he gave this abbreviated version out of fear because he did not know if the [Petitioner] was going to come back. He admitted that he did not tell anyone that he knew that the Defendant was the assailant.

Later, Peete gave a second statement to the police in which he claimed that someone else told him that the [Petitioner] was the perpetrator. He testified that he did this because, at the time, the [Petitioner] was "still out ... on the run," and he remained frightened of the [Petitioner]. After Peete gave his second statement to the police, the police arrested him [,] and he was charged with the felony murder of the victim. Peete testified that, as of the time he was testifying, his case had not been disposed of. He also stated that he had not received anything for his testimony.

Casey Colbert, 2013 WL 3128698, at *7-8.

At the post-conviction hearing, trial counsel stated that although the defense filed a notice of alibi, the State failed to file any response to this notice informing him that it had witnesses who would place the Petitioner at the scene. Trial counsel admitted he was not

- 6 -

aware that the State was required to provide such a response under Rule 12.1(b). Based on the two prior statements by co-defendant Peete that trial counsel had received, trial counsel was "shock[ed]" when co-defendant Peete testified at trial that the Petitioner was the shooter, which was "detrimental to the defense." He also insisted that had he been given proper notice of co-defendant Peete's testimony identifying the Petitioner as the shooter, he would not have argued during his opening statement that no one would identify the Petitioner as the perpetrator. Trial counsel was unable to explain why he failed to object or request a mistrial when the State presented co-defendant Peete as a witness.

In denying relief, the post-conviction court acknowledged that trial counsel "should have objected and sought to strike [co-defendant] Peete's testimony." However, the court stated that it was "unclear what effect, if any, such an objection would have had on the jury or the proof as a whole at trial." It noted that there was no basis for trial counsel to object to co-defendant Peete being called as a witness generally because Peete was charged as co-defendant, had given multiple statements, and was present during the shooting. It also found that the State "had legitimate reasons for calling [co-defendant] Peete based solely on his prior statements, irrespective of the new information offered during [co-defendant] Peete's trial testimony" and that it was "not at all clear" that the State knew co-defendant Peete would identify the Petitioner as the shooter during trial. The post-conviction court determined that "[a]n objection lodged to the general testimony of [co-defendant] Peete would surely have been overruled." It then found that even if trial counsel had objected and made a motion to strike co-defendant Peete's testimony, it was unlikely that co-defendant Peete's testimony would have been excluded pursuant to Rule 12.1(b) because trial counsel had no ethical basis to move forward with an alibi defense at the time of trial. It also determined that if trial counsel had requested a mistrial, it was unlikely that the trial court would have granted such a drastic remedy, given that Peete was a charged co-defendant who the defense knew could be a witness and whose prior statements had been given in discovery. The post-conviction court also held that even if trial counsel should have objected or requested a mistrial based on co-defendant Peete's surprise testimony identifying the Petitioner as the shooter, the Petitioner failed to show that he was prejudiced in light of the overwhelming evidence of his guilt, aside from co-defendant Peete's testimony.

It is fundamental that the "primary purpose of the criminal trial is to discover the truth." State v. Gilford E. Williams, No. W1999-01556-CCA-R3-CD, 2001 WL 43176, at *3 (Tenn. Crim. App. Jan. 17, 2001). "This goal can only be achieved by the avoidance of unnecessary surprise, through complete and reciprocal discovery." Id. (citing State v. Brown, 552 S.W.2d 383, 386 (Tenn. 1977); State v. Gaddis, 530 S.W.2d 64, 69 (Tenn. 1975) (endorsing "broad and reciprocal discovery" and noting decline of "trial by ambush" and "sporting theory of justice")). It is perplexing for either side in any litigation to be faced with unanticipated testimony, expert or otherwise, on material issues. Id. With this

principle in mind, Rule 12.1 of the Tennessee Rules of Criminal Procedure provides, in pertinent part:

> Upon written demand of the district attorney general stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney general a written notice of an intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.

Consistent with the United States Supreme Court mandate in Wardius v. Oregon, the rule further provides for the State to disclose, within ten days of receiving the defense notice, the names and addresses of the witnesses upon whom the State intends to rely to establish a defendant's presence at the scene and any witnesses upon whom the State will rely to rebut a defendant's alibi. 412 U.S. 470 (1973) (noting that Due Process Clause of the 14th Amendment forbids the enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants; in absence of fair notice that defendant would have an opportunity to discover the state's rebuttal witnesses, defendant cannot be compelled to reveal his alibi defense); Tenn. R. Crim. P. 12.1(b). The rule imposes a continuing duty for the parties to disclose before and during trial the existence of an additional witness who should have been included before and during trial. Tenn. R. Crim. P. 12.1(c). Tennessee Rule of Criminal Procedure 12.1(e) allows the trial court, for good cause shown, to grant an exception to any of the requirements of Rule 12.1. Factors to be considered in determining whether excluding undisclosed alibi proof constitutes error include:

> (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors arising out of the case.

State v. Looper, 118 S.W.3d 386, 423 (Tenn. Crim. App. 2003); State v. Bell, No. W2011-01424-CCA-R3-CD, 2012 WL 3156579, at *6-7 (Tenn. Crim. App. Aug. 2, 2012) (concluding that trial court found good cause to allow exception to notice requirement). Attempts to intentionally circumvent the Rule will defeat the purpose and only solicit leniency by the court when the adverse party engages in similar chicanery. See McClendon v. United States, 587 F.2d 384 (8th Cir. 1978) (purpose behind the reciprocal alibi notice discovery rule is to prevent, among other things, prejudicial surprise to the parties;

however, where there is not material prejudice resulting to the defendant by the state's nondisclosure there is no reversible error).

The factual situation presented here however does not lend itself to neat disposition under the Rule because the alibi testimony the Petitioner asserts the State failed to provide notice of was from the Petitioner's co-defendant. The record shows that the Petitioner filed his Rule 12.1 notice of alibi on August 26, 2010, and that the State later filed its demand for such notice. Rule 12.1(b)(1) clearly states that if a defendant serves a notice pursuant to Rule 12.1(a)(2), "the district attorney general shall disclose in writing to the defendant" the name and address of each witness on whom the State intends to rely to establish the defendant's presence at the scene of the alleged offense and to rebut testimony of any of the defendant's alibi witnesses. The record shows that prior to trial the State provided the Petitioner with open file discovery, which included both of co-defendant Peete's prior statements to law-enforcement claiming, in relevant part, that (1) a masked individual was the perpetrator of the offense; and (2) another individual named "Benny" told him that the Petitioner was the perpetrator of the offense. Peete's subsequent indictment, inherent status as a codefendant turned State's witness, and the trial transcript establish that the State knew prior to trial that co-defendant Peete had first-hand information that would place the Petitioner at the time and place of the offense. In addition to the State's continuing duty to disclose under Rule 12, this scenario implicated the State's obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (stating that in order to establish a Brady violation, the defendant must show that (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is required to release the information whether requested or not); (2) the State suppressed this information; (3) this information was favorable to the accused; and (4) this information was material)). There can be no question that co-defendant Peete's trial testimony identifying the Petitioner as the shooter was inconsistent with the statements previously provided to the defense and thus qualified as "favorable to the accused" to impeach co-defendant Peete. Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) ("Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses."); United States v. Barraza Cazares, 465 F.3d 327, 333-35 (8th Cir. 2006) (co-defendant's statement exculpatory because relevant to defendant's role in conspiracy and related to expert testimony presented by government). The State failed to fulfill its reciprocal discovery obligations, and trial counsel was deficient in failing to so object.

We must now determine what, if any, prejudice the Petitioner suffered as a result of trial counsel's failure to object to the State's violation of Rule 12.1(b) and the impact of

the State's failure to disclose impeachment material under <u>Brady</u>. In doing so, we revisit the relevant portions of the facts as outlined in our direct appeal:

Charles Smith testified that, on the evening of the offense, the Petitioner, whom Smith knew from the neighborhood, told Smith that he was going to rob or "pop "Ben" because "Ben" had three or four thousand dollars on him. After this conversation, the Petitioner got in the car with co-defendant Peete, the two men drove away, and returned fifteen minutes later. At this point, Smith started to leave and saw the victim pull up alongside the street with two or three people in the victim's truck. Smith saw co-defendant Peete walk up to the victim's truck, and about fifteen minutes later, Smith heard a gunshot. He testified, "I ran back down there and I seen [the victim] running around the curve and laid down on the curve beside the trash cans with a bullet hole in his chest." Smith testified that co-defendant Peete was still there, but he did not see the Petitioner at the scene. He did not see the Petitioner shoot the victim.

Dana Pruett was the sister of Stacy Pruett and girlfriend of co-defendant William Peete. Dana Pruett was also the girlfriend of Joshua Russell. She was acquainted with the Petitioner because of his friendship with her boyfriend and because he spent a lot of time at the back house. Pruett knew that the Petitioner had a silver and black handgun because she kept the gun in a drawer in her room to keep it away from the children. She testified that she had seen the Defendant with this gun prior to the offense, and she never saw the Petitioner with it again after the offense.

Joshua Russell, Dana Pruett's boyfriend, testified that on the night of the offense, between 10:00 and 10:30 p.m., Russell and Pruett were putting her baby to bed. He stated that Pruett fell asleep, and he went to get something to eat. He heard a gunshot and went outside to investigate. He testified, "I seen [sic] a black male about two steps from the woods and then I seen [sic] [the victim] on the ground with the garbage can had flipped over on top of him." After realizing the victim had been shot, he returned to the house and told Pruett to call 911. Russell testified that he had last seen the Petitioner about an hour to an hour and a half prior to laying the baby down. He did not see the Petitioner after he heard the gunshot. Prior to the shooting, the Petitioner had told Russell that he "need[ed] a lick" or "[a]n easy way to come across money." Russell also testified that, prior to the shooting, he had seen the Defendant with a 40-caliber semiautomatic pistol with silver on it. After the victim was shot, the Petitioner called Russell on Russell's cell phone and said, "I've been in the club for the last two hours. I can't hear you, I'm going to call you back when I go outside the club." Russell stated that the victim had been "flashing large sums of money" by "driving around talking about how much money he had and holding it out like this out the window." He added, "And where we live you don't do that."

Shelby Thompson, the victim's girlfriend at the time he was killed, was with the victim a little before 10:30 p.m. on the night of the offense, and she testified that when they pulled up in front of the Pruetts' house, co-defendant Peete got out of his car and walked up to the driver's side of their truck. The only thing she remembered was the sound of feet, someone coming up to the window and "putt[ing] a gun in the window and tell[ing] [the victim] to give him all his money and shot." The only thing she could remember about the shooter was he was "wild-eyed. Like, almost like he was scared too." She added that the shooter was wearing a red bandana over his face. She testified that the victim got out of the truck and ran off. The shooter ran after him. She got out of the truck and asked co-defendant Peete what to do. Peete did not respond but jumped a fence. She followed him. She and Peete then approached the victim, who was lying on the ground. She did not walk up to the victim but began calling the police.

Nicholas Parker testified that, at the time in question, he lived "at the opposite end of the street where the incident happened." He testified and confirmed in large part the testimony of Thompson concerning the events leading up to the offense. He agreed that while at a gas station, a "heavy set, bald black guy" came up to the driver's door and told the victim to come by the house, "that he'd smoke a blunt with him." Parker did not know who this man was. The victim agreed to come by. When they pulled up to the house, "the guy that was at the store walked out and walked around to the driver's door and pulled the blunt out and lit it." The man "hit it a couple of times" and then passed the "blunt" to the victim. The next thing Parker remembered was the sound of footsteps, a guy running up to the driver's door, pointing a gun in the victim's face and demanding his money. Parker could not identify the perpetrator and observed only "a red bandana up to his nose and something black over the top of his head where just like the eyes where you can see[.]" Parker stated that the gun was a semiautomatic and "a larger caliber."

Benjamin Sykes testified that he spent a lot of time with the Pruetts' and that he also knew the victim. He also knew the Petitioner and stated that they had become friends when Sykes was twelve years old. They spent a lot of time together, including smoking marijuana and snorting powder cocaine. Sykes had received disability payments for ADHD and took medication for it. Three or four weeks before the shooting, Sykes saw the Petitioner with a weapon. On the night of the offense, Sykes was visiting another friend, smoking marijuana, and drinking beer. He saw police cars nearby and called the Petitioner, who answered and sounded "[l]ike he was trying to catch his breath while he was running." The Petitioner told Sykes that he, the Petitioner, thought that he had shot someone. Sykes ended the phone call, but the Petitioner called him later that night. The Petitioner asked Sykes, "did he die or anything?" Sykes responded affirmatively. Sykes later spoke with the police and identified the Petitioner from a photographic array.

Sykes acknowledged that he had been convicted of aggravated assault on July 25, 2011. While he was in jail for that offense, he saw the Petitioner, who told him "to call this investigator and make another statement saying that [he, Sykes] was slow and [he's] on medication and that [he] get [sic] a check." The Petitioner also told Sykes that he should change his story to the effect that the caller was not the Petitioner and that it was hearsay. The Petitioner also wrote him a letter telling him how to change his story. On cross-examination, Sykes denied that co-defendant Peete had discussed robbing the victim with him. He admitted that co-defendant Peete had talked to him on May 7 about "hitting a lick" but denied that Peete referred to the victim's name.

Because this court has previously held that the trial court erred in consolidating the Petitioner's indictments, we will abbreviate our consideration of the testimony of Tiffany Benson in our analysis. Tiffany Benson testified that, in May 2009, she had been dating the Petitioner for about four months. As of May 7, 2009, she did not know the victim, the Pruetts, Smith, Peete, or Sykes. "[L]ater on" during the night of May 7, 2009, the Petitioner came by Benson's home after calling her and telling her that he wanted to talk to her. When he arrived thirty minutes to an hour later, he "looked normal, just like his shirt looked like it had been ripped or something." Later that evening, Benson noticed that the Petitioner was watching the news on television. She testified that the Petitioner told her "that it was a plan, it supposed to have been a plan," "[t]hat he ran up to a truck and laid everybody down." He told her "that he tried to lay everyone down and the guy wouldn't lay down so he pulled the gun on him." He told her that, after he pulled the gun, it "went off." At that point, the Petitioner told her, he "just start running." The Petitioner did not tell her who the victim was or where the shooting occurred. Benson described the Petitioner's demeanor during this conversation as "scared, frightened, like he really didn't want to tell [her]."

A. Notice of Alibi Violation. We must note at the top of our analysis that a close reading of the trial transcript shows that trial counsel abandoned any effort to proceed with his alibi theory of defense before trial. When the State asked the court for time to speak with Walter Patterson, the purported defense alibi witness, because they had been unable to subpoena him, trial counsel responded they did not intend to call him at trial based on their prior interviews with him. Trial counsel additionally testified at the post-conviction hearing that he could not proceed forward with his initial alibi defense, not because of the State's failure to timely provide him with information rebutting his purported alibi witness, but because he was ethically prohibited from doing so. The record does not reveal the precise nature of trial counsel's ethical conflict, and it presumably involved presenting potentially false testimony from the defense alibi witness. See, e.g., United States v. Curtis, 742 F.2d 1070, 1074 (7th Cir. 1984) (where defendant admitted his involvement in offense to defense counsel after co-defendant's turned government witnesses admitted to defense counsel that defendant was involved in the offense and concluding that in accordance with ethical obligation to refrain from knowingly using perjured testimony or false evidence,

defense counsel properly refused to present the alibi witnesses). When a defendant manufactures false alibi witnesses, this court is hard pressed to subsequently conclude that he suffered prejudice based on his own wrongdoing.

In any event, in regard to trial counsel's failure to object to the State's violation of Rule 12.1(b), the Petitioner's main complaint is that trial counsel would not have made the comment in opening statement that no one would place the Petitioner at the scene of the offense. We agree that this could have easily been avoided had trial counsel properly objected to the State's violation of Rule 12.1(b), to the extent that Rule 12 was genuinely in play. However, for the reasons that follow, we do not believe the Petitioner has established actual prejudice. First, the only person to place the Petitioner at the time and place of the offense was his co-defendant, the person with whom the Petitioner was criminally responsible in the death of the victim. The credibility of co-defendant was in question prior to trial, and trial counsel exhaustively cross-examined the co-defendant over a period of two-days. Although trial counsel viewed the case as entirely circumstantial without the testimony of co-defendant Peete, the Petitioner told two witnesses that he needed money or intended to rob the victim on the day of the offense, and he confessed his involvement to shooting the victim to two other witnesses. The remedy for a violation of the rule is limited to a continuance, exclusion of the testimony, or a mistrial. We conclude that even if trial counsel was given more time to prepare or the testimony of co-defendant Peete was excluded, it would not have made a difference in the outcome of the trial.

B. Brady. In regard to trial counsel's corresponding failure to object the State's failure to disclose impeachment evidence under Brady, we forego full analysis because co-defendant Peete's inconsistent statement identifying the Petitioner as the shooter fails to meet the materiality prong, the basis under the Brady test which triggers a new trial. The Tennessee Supreme Court defined "material" within the context of Brady:

> Evidence is deemed to be material when "*there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.*" [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

Johnson v. State, 38 S.W.3d 52, 58 (citations omitted) (emphasis added). As we alluded to in the previous section, the State's case against the Petitioner was strong. Trial counsel was already in possession of material with which to impeach co-defendant Peete, and the fact that trial counsel did not have additional impeachment material did not deprive the

Petitioner of a fair trial. Because the Petitioner failed to show that the evidence was material, he is not entitled to relief.

Related to this issue, the Petitioner makes several stand-alone constitutional claims that he is entitled to plain error and cumulative error relief because the State committed prosecutorial misconduct by unfairly surprising the defense with co-defendant Peete's testimony at trial and by willfully withholding concessions made to co-defendant Peete in exchange for his testimony against the Petitioner at trial. In response, the State asserts that the Petitioner has waived these claims by failing to raise them on direct appeal. We agree with the State and conclude that these claims are waived.

**Failure to Present Alibi and Third-Party Perpetrator Defenses.** The Petitioner next argues that trial counsel was ineffective in failing to present an alibi defense by showing that the Petitioner was with Walter Patterson, the purported alibi witness, at the time of the crimes. He asserts that if trial counsel had called Patterson to so testify, this evidence would have corroborated the defense theory that the Petitioner was not the shooter and would have impeached several witnesses who testified against the Petitioner at trial. As outlined in the above section, at the post-conviction hearing, trial counsel testified that he could not "ethically" put Walter Patterson on the stand in light of the Petitioner's numerous post-offense admissions and attempts to coerce the State's witnesses. In denying relief, the post-conviction court accredited trial counsel's testimony on this issue and found that trial counsel "was prepare[d] for trial[,]" and "put together a coherent theory of defense" but that trial counsel's "theory of defense was undermined by petitioner to the point that his conviction became . . . an inevitability." In addition to our previously expressed concerns about the speciousness of the Petitioner's purported alibi, we conclude that the evidence of the Petitioner's guilt, including his inculpatory admissions to Sykes and Benson immediately after the shooting, was overwhelming. Accordingly, we conclude that the Petitioner has not shown that trial counsel's failure to present the alibi defense was deficient.

The Petitioner also argues that trial counsel failed to present a third-party perpetrator defense by showing that co-defendant William Peete and Benjamin Sykes had a plan to rob the victim. He claims that Sykes had a motive to commit the offenses because Sykes admitted he was in dire need of money to pay his light bill the day of the shooting. He also claims that Sykes fit the description of the perpetrator given by Shelby Thompson, that Sykes admitted he was in the area of the crime scene, and that Sykes told investigator Vita Zelikov he met up with co-defendant William Peete and Stacy Pruett to talk about the shooting after the police left the crime scene. The Petitioner asserts that trial counsel should have used this evidence of a robbery plan to show that Benjamin Sykes and William Peete were responsible for the victim's death, not the Petitioner. He also asserts that despite the

admission of the letters and phone calls related to the coercion and bribery charges, trial counsel still had a duty to present a legitimate defense for him at trial.

At the post-conviction hearing, trial counsel stated that he attempted to point the finger at Benjamin Sykes as a possible third-party perpetrator. He said that although he was able to get Sykes to admit on cross-examination that Sykes had talked with co-defendant William Peete about "hitting a lick," Sykes denied that co-defendant William Peete identified the victim by name. Trial counsel said that Sykes admitted during his interview with Zelikov that he and co-defendant William Peete discussed robbing the victim specifically, as well as robbing a Mexican restaurant. However, he said he did not want to impeach Sykes with Zelikov's report because Sykes had also told Zelikov that he was not interested in co-defendant William Peete's plan to rob the victim. Trial counsel explained that it was common for defense attorneys to make a "strategic choice" between impeaching someone directly or leaving a question open-ended in order to argue the point to the jury, and he asserted that any third-party perpetrator would have denied involvement in forming a robbery plan if he had asked that question directly.

With regard to the claim that trial counsel failed to present evidence of Benjamin Sykes's guilt, the post-conviction court concluded, in relevant part, as follows:

> This court does not find counsel was ineffective in his cross[-]examination of Sykes. Counsel used the information gathered during the defense investigation to attempt to impeach Sykes and argued that point to the jury. This court agrees that the investigators synopsis of his conversations with Sykes could not be introduced as impeachment evidence once Sykes had denied conspiring with William Peete. The conversations were not recorded or written and were not signed by Sykes. Thus, the court finds [P]etitioner is not entitled to relief on the basis of his claim. Moreover, regardless of whether [P]etitioner called Sykes[,] as Sykes testified at trial[,] or Sykes contacted [P]etitioner, this fact would not contradict or change Sykes['s] claim that he spoke with [P]etitioner shortly after the murder and [P]etitioner told him he had "shot someone." Additionally, any inconsistencies in Sykes['s] accounts regarding whose phone was used [or] who was present when the call was made w[ere] minimal and not material. Thus, counsel was not ineffective in further investigating this call. Moreover, [P]etitioner has failed to present any proof in support of his claims; and, thus, is not entitled to relief.

In denying relief, the post-conviction court held that "it was petitioner's actions that were directly responsible for his conviction[s] in this case and offered the greatest evidence against him." We conclude that trial counsel effectively presented a third-party perpetrator

- 15 -

defense by eliciting an admission from Sykes on cross-examination that co-defendant William Peete had talked to him about "hitting a lick" and by impeaching co-defendant William Peete with his different statements about the shooting. Because trial counsel pursued a reasonable trial strategy with regard to Sykes and Peete, the Petitioner has not shown that trial counsel's handling of the third-party perpetrator defense was deficient.

**Failure to Conduct a Reasonable Investigation.** The Petitioner argues that trial counsel was ineffective in failing to conduct a reasonable investigation and in failing to argue facts to the jury that were consistent with the defense's theory of the case. The post-conviction court made the following findings and conclusions:

> This court finds [P]etitioner had the benefit of at least two trial attorneys working on his case and a defense investigator. Lead trial counsel testified that he reviewed the entire case; directed his investigators to speak to witnesses and conduct other tasks; and reviewed the entirety of their investigation. He stated he was prepared for trial. However, counsel repeatedly emphasized that the presentation of the defense theory of the case was greatly impacted by the negative actions of the [P]etitioner which further implicated him in the crime. He stated that in the beginning, he felt the defense had a legitimate strategy of challenging the identity of [P]etitioner as the shooter. He stated, however, that as time went on [P]etitioner's repeated attempts to influence or coerce witnesses and his prolific correspondence with key witness Tiffany Benson became more than the defense could overcome and indicated that it was [P]etitioner's actions that were directly responsible for his conviction in this case and offered the greatest evidence against him. The court accredits counsel's testimony on this point and finds not only was counsel familiar with the facts; conducted an adequate investigation and was prepare for trial—counsel also put together a coherent theory of defense. However, that theory of defense was undermined by [P]etitioner to the point that his conviction became in the words of counsel an inevitability.

Initially, the Petitioner asserts that trial counsel failed to investigate and interview Joshua Walton, who gave a statement asserting that co-defendant William Peete attempted to bribe Walton to tell the police that co-defendant Peete was not involved in the crimes against the victim. The Petitioner claims this evidence could have impeached co-defendant Peete's credibility and could have undermined the credibility and truthfulness of Joshua Russell, Heather Emery, Charles Smith, and Dana Pruett, who were all relatives of Stacy Pruett, co-defendant Peete's girlfriend, and who may have been bribed to give false testimony against the Petitioner. In his May 25, 2009 statement to police, Joshua Walton explained that he was incarcerated at the time the victim's homicide occurred and that he

did not know who was responsible for the victim's death. Walton then identified co-defendant Peete from a photographic lineup. He explained that, while he and co-defendant Peete were housed together at the jail, co-defendant Peete said that if Walton "told homicide investigators [co-defendant Peete] didn't have anything to do with the [victim's] case[,] that [co-defendant Peete] would have his girl or wife pay [Walton's] bail." Walton also said co-defendant Peete told him "he would make sure that no other inmates bothered [him]" and that co-defendant Peete "would look after [him]." As to whether trial counsel provided ineffective assistance on this issue, we conclude that any use of Walton's statement could have more firmly linked co-defendant Peete and the Petitioner in a plan to rob the victim and could have helped establish the Petitioner as the shooter. Accordingly, we conclude that the Petitioner has not demonstrated that trial counsel was deficient in failing to investigate and interview Joshua Walton.

Next, the Petitioner argues that trial counsel failed to conduct a reasonable investigation into his cell phone records. He claims that because the only two numbers that called his cell phone after the shooting belonged to Darrius Bell and Bernard Martin, this information impeached Benjamin Sykes's testimony at trial that Sykes called the Petitioner on the night of May 7, 2009, and that during this conversation, the Petitioner admitted he thought he had shot someone. Initially, we recognize that the phone records were never authenticated at the post-conviction hearing and were admitted into evidence without any detailed testimony concerning their contents. Moreover, despite the Petitioner's claim that the only two numbers who called his cell phone belonged to Bell and Martin, our evaluation of these records shows that there were a substantial number of incoming calls from unidentified numbers made to the Petitioner's cell phone and a substantial number of outgoing calls to unidentified numbers made from the Petitioner's cell phone shortly after the shooting. Therefore, we conclude that the Petitioner has not established that trial counsel's investigation into his phone records was deficient.

Similar to the previous issue, the Petitioner argues that trial counsel failed to conduct a reasonable investigation into Darrius Bell and Bernard Martin, claiming that their testimony could have impeached Sykes's testimony that the Petitioner admitted to Sykes that he thought he had shot someone. In light of the sheer number of phone calls made to and from the Petitioner's cell phone shortly after the shooting, we conclude that the Petitioner has failed to establish that trial counsel's performance as to this issue was deficient.

In addition, the Petitioner claims that trial counsel failed to conduct a reasonable investigation into Heather Emery, whose testimony at trial varied from her statement to police. He claims that at trial, Emery testified that she saw the Petitioner come into the home shortly before the shooting and pick up a wadded up shirt before leaving, which implied that the Petitioner concealed a gun in the wadded up shirt and placed the Petitioner

at the crime scene shortly before shooting. However, the Petitioner asserts that in her statement to the police, Emery disclosed that her husband was the one who saw the Petitioner come into the house and get a shirt prior to the shooting. The Petitioner argues that because Emery gave conflicting accounts and testified to an incident she did not personally observe in order to connect him to the crimes, trial counsel should have investigated Emery. Initially, we recognize that because the Petitioner failed to present the testimony of Heather Emery at the post-conviction hearing, we cannot speculate on what her testimony might have been if introduced. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). We agree with the post-conviction court's finding that any inconsistencies in Emery's statements were not "particularly great or relevant to the defense theory of the case or the credibility of the witness." Therefore, the Petitioner has failed to show that trial counsel was deficient in his investigation of Heather Emery.

Lastly, the Petitioner contends that trial counsel failed to investigate Detective Mark Miller's supplement, which he claims could have been used to impeach co-defendant Peete. In his supplement, Detective Miller noted that co-defendant Peete disclosed at the crime scene that the perpetrator ran up to the victim's truck while co-defendant Peete was standing outside it talking to the victim; that the perpetrator pointed a pistol at co-defendant Peete and told him to get his hands up and to "back off the truck;" that co-defendant Peete complied and ran off; that as co-defendant Peete was running away, he heard one shot; and that co-defendant Peete saw the perpetrator, whom he never identified, run eastbound through the woods up to the railroad tracks. Our evaluation of the record shows that Detective Miller's supplement did not have any great exculpatory value and that trial counsel exhaustively impeached co-defendant Peete on the basis that Peete's statements to police greatly differed from his testimony at the Petitioner's trial. Thus, we conclude the Petitioner has not demonstrated that trial counsel's investigation into Detective Miller's supplement was deficient.

**Failure to Call Certain Witnesses at Trial.** The Petitioner also contends that trial counsel was ineffective in failing to call Kevin Peete, Darrius Bell, Bernard Martin, Detective Miller, defense investigator Vita Zelikov, and Joshua Walton to testify at trial. The post-conviction court determined, in relevant part, as follows:

> This court finds petitioner failed to present the testimony of . . . Joshua Walton; Lt. Ragland; Detective Miller . . . or Vita Zelikov to testify at the post-conviction hearing. . . . Thus, the court finds as to these witnesses petitioner has failed to demonstrate counsel was ineffective in failing to call them to testify. Specifically, as it relates to investigator, [Vita] Zelikov, this

court notes counsel indicated that he reviewed all of the investigation in the case but stated it was difficult to call investigators for purposes of impeachment because the statements they took were not recorded or signed by the witnesses but rather were general impressions of the investigator and synopsis of their conversations with the witnesses. Therefore, it is unclear the investigator could be called to impeach those witnesses. Thus, the court further finds, even if the rule in Black did not apply [because the Petitioner did not present Zelikov to testify at the post-conviction hearing], [P]etitioner failed to demonstrate counsel was ineffective in failing to call the defense investigator at trial.

This court further finds that neither Dar[r]ius Bell or Bernard Martin provided any relevant testimony which, even if presented, may have affected the outcome of [P]etitioner's trial. Bell testified that on the night of the victim's murder, [Petitioner] called him between 10:00 p.m. and 11:00 p.m. and made plans to "hang out" later in the evening. He stated he had not seen the [Petitioner] in person for several weeks prior to the offense and indicated it could have been months since he had last spoken to [Petitioner] by phone. This court finds the evidence failed to establish an alibi and could have been considered by jurors as evidence of [Petitioner]'s attempts to cover up the murder by trying to manufacture an alibi. As such, this court does not find counsel's decision not to call Bell was ineffective. As to Martin, this court finds his testimony had no relevance at all. He could not recall his number from 2009 and could provide no details regarding [Petitioner]'s whereabouts on the evening in questions.

Finally, the court finds, although counsel did not call Kevin Peete at trial he did in fact question William Peete about Kevin Peete's assertion that William Peete stated, on the evening of May 7, 2009, "we getting ready to get" a pistol, a .40 or .45 caliber, and "get Ben, [the victim,]" because Ben had some money. William Peete denied this allegation. Kevin Peete stated he did not know to whom William Peete was referring when William Peete said "we" and he did not witness the shooting. It's unclear that Kevin Peete could be called to testify regarding this statement. Even so, his testimony would have added little to the proof.

William Peete was charged along with [P]etitioner under a theory of criminal responsibility. While Kevin Peete's testimony may have further impeached William Peete it did nothing to bolster the defense team's attempt to present a third[-]party defense. Moreover, nothing about this information changed the fact that, although William Peete may have set up the robbery,

Peete was clearly not the shooter. As counsel explained at the post-conviction hearing, the issue in pointing the finger at Peete was that such a strategy likely also pointed the finger at [P]etitioner as well and by tying the two together clearly implicated [P]etitioner as the shooter in their scheme. Numerous trial witnesses, who were within the victim's vehicle at the time of the shooting, clearly recalled seeing William Peete approach the vehicle and interact with the victim and indicated he was not the same individual who shot the victim. Thus, even though the jury may have considered this as impeachment evidence or inculpatory evidence against William Peete, this proof did not implicate William Peete as the shooter and if the goal was to tie William Peete to a scheme to rob the victim, nothing about this proof would exonerate [P]etitioner or diminish his involvement. Rather it could have the opposite effect of tying William Peete to the scheme to rob the victim and since William Peete and the [P]etitioner were seen together in the minutes before the shooting, thereby, further implicat[ing] [P]etitioner as the shooter. Thus, this court does not find counsel's strategic choice not to call Kevin Peete to impeach the testimony of William Peete . . . unreasonable or based upon a lack of preparation or in any way fell below an objective standard of reasonable practice under the circumstances. Moreover, even if the court were to find counsel were ineffective in failing to call Kevin Peete as a witness, the [P]etitioner has failed, given the thorough cross examination of William Peete, to demonstrate he was prejudiced by counsel's inaction.

First, the Petitioner claims trial counsel was ineffective in failing to call Kevin Peete, whose testimony he claims could have firmly established co-defendant Peete as an accomplice, could have impeached co-defendant Peete's testimony identifying the Petitioner as the perpetrator, and could have provided an alternate theory that co-defendant Peete and Benjamin Sykes were responsible for shooting the victim. The Petitioner argues that Kevin Peete's testimony was critical to proving that immediately after the shooting, co-defendant Peete and Stacy Pruett began bribing witnesses to give false information in an attempt to frame the Petitioner for the victim's death and to cover for the real perpetrators, Benjamin Sykes and co-defendant Peete. We conclude that the record fully supports the post-conviction court's holding that nothing about Kevin Peete's testimony would have exonerated the Petitioner or diminished his involvement in this crime and that Kevin Peete's testimony could have had the opposite effect of further implicating the Petitioner as the shooter. Consequently, the Petitioner has not established that trial counsel's failure to call Kevin Peete at trial was deficient.

As his next two issues, the Petitioner contends that trial counsel was ineffective in failing to call Darrius Bell and Bernard Martin, presumably for the purpose of impeaching Benjamin Sykes's testimony that the Petitioner admitted that he thought he had shot

someone. We reiterate that the Petitioner's phone records show that a substantial number of calls were made from the Petitioner's cell phone and to the Petitioner's cell phone shortly after the shooting, thereby making Bell's and Martin's testimony on this issue irrelevant. Accordingly, the Petitioner has not established that trial counsel's failure to call Bell and Martin was deficient. Fourth, the Petitioner contends that trial counsel was ineffective in failing to call Detective Mark Miller, who could have impeached co-defendant Peete's credibility by testifying that co-defendant Peete provided an oral statement to him shortly after the crimes that was inconsistent with co-defendant Peete's trial testimony. Initially, we recognize that because the Petitioner failed to present the testimony of Detective Miller at the post-conviction hearing, we cannot speculate on what his testimony might have been if introduced. See id. In any case, for the same reasons as outlined above, we believe that Detective Miller's testimony would not have had substantial exculpatory value, given that trial counsel thoroughly impeached co-defendant Peete on the basis that co-defendant Peete's written statements to police were inconsistent with his trial testimony. Thus, we conclude that the Petitioner has failed to show that trial counsel's failure to call Detective Miller was deficient.

Fifth, the Petitioner argues that trial counsel was ineffective in failing to call Vita Zelikov, the defense investigator in this case, who interviewed Benjamin Sykes and Joshua Russell and made certain findings after reviewing the 9-1-1 tape. The Petitioner claims that Zelikov's testimony would have impeached the testimony of Benjamin Sykes and Joshua Russell, but he fails to specifically explain how Zelikov's testimony would have impeached Sykes and Russell. In any case, the record shows the Petitioner did not present Zelikov to testify at the post-conviction hearing, and we may not speculate as to what Zelikov's testimony might have been. See id. Accordingly, we conclude that the Petitioner has not established that trial counsel's failure to call Zelikov at trial was deficient.

Sixth, the Petitioner asserts that trial counsel was ineffective in failing to call Joshua Walton, who could have testified that co-defendant Peete attempted to bribe Walton to tell the police that Peete did not have anything to do with the victim's case. The Petitioner asserts that he was unable to have Walton testify at the post-conviction hearing because Walton recently died, though Walton was alive at the time of the trial, and the Petitioner claims to have attached Walton's certified death certificate to the appendix to his brief. Even if the Petitioner did attach Walton's death certificate, this court cannot consider documents attached to briefs because they are not properly a part of the certified record. See State v. Bobadilla, 181 S.W.3d 641, 643 (Tenn. 2005) ("What is in the record sets the boundaries for what the appellate courts may review, and thus only evidence contained therein can be considered."); LaBryant King v. State, No. M2004-01371-CCA-R3-PC, 2005 WL 1307802, at *3 n.3 (Tenn. Crim. App. June 1, 2005) ("While our Rules of Appellate Procedure permit an appellant to file an appendix containing relevant portions of a record, see Tennessee Rule of Appellate Procedure 28, the documents must also be

included in the record itself."). Because Walton's death certificate was not included in the appellate record, we cannot consider it. Moreover, as we recognized in the first section, Walton's testimony could have more firmly linked co-defendant Peete and the Petitioner in a plan to rob the victim and could have helped establish the Petitioner as the shooter. Therefore, we conclude that the Petitioner has not demonstrated that trial counsel's failure to call Joshua Walton was deficient.

**Failure to Cross-Examine and Impeach Certain Witnesses.** The Petitioner maintains that trial counsel was ineffective in failing to impeach Heather Emery with her police statement and her relationship with Stacy Pruett; in failing to impeach Joshua Russell with the 9-1-1 call, his relationship with Stacy Pruett and William Peete, his statement to the defense investigator, and his cell phone records; in failing to impeach Benjamin Sykes and Tiffany Benson with his cell phone records; and in failing to impeach William Peete with Detective Miller's report. The post-conviction court made the following findings and conclusions:

> This court first noted that none of these witnesses[, namely Heather Emery, Joshua Russell, Benjamin Sykes, and Tiffany Benson,] were called to testify at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). Thus, the court cannot adequately judge what impact any alleged impeachment evidence may have had on their trial testimony. Moreover, specifically as to witness Emery, trial counsel testified at the post-conviction hearing that he did not feel the alleged impeachment was particularly helpful or that the inconsistencies pointed out by [P]etitioner were particularly great or relevant to the defense theory of the case or the credibility of the witness. This court agrees.

> Counsel further stated that he feared further impeachment of Sykes or Benson would potentially open the door for the state to put on additional evidence of coercion; therefore, he made a strategic decision to limit his cross-examination of those witnesses and argue certain inferences of their testimony to the jury. He also stated that he did not directly challenge Sykes on his involvement because he wanted to be able to argue certain information to the jury. The court does not find counsel's actions were unreasonable or fell below the standards of prevailing professional norms. Thus, [P]etitioner has failed to demonstrate by clear and convincing evidence either that counsel was ineffective or that he was prejudiced by counsel's action or inaction.

Finally, counsel indicated that the defense team had Joshua Russell's phone records but could not recall the nature of the investigation into those records. This court finds counsel has failed to present sufficient evidence to establish additional impeaching information was available that should have been used by counsel to counter the testimony of Russell. Thus, he, likewise, is not entitled to relief based upon this claim.

First, the Petitioner asserts that trial counsel failed to cross-examine and impeach Heather Emery, Stacy Pruett's aunt, regarding her relationship with Stacy and regarding Emery's inconsistent statement to police. Again, we recognize that because the Petitioner did not present Emery to testify at the post-conviction hearing, we may not speculate as to what her testimony might have been. See id. In any case, we agree with the post-conviction court's holding that any inconsistencies in Emery's statements were not "particularly great or relevant to the defense theory of the case or the credibility of the witness." We also conclude that the fact that Emery was Stacy Pruett's aunt did not have great impeachment value. Consequently, we conclude that the Petitioner has not shown that trial counsel was deficient in failing to impeach Emery.

Second, the Petitioner also asserts that trial counsel failed to play the 9-1-1 call placed on May 7, 2009, at this trial for the purpose of impeaching Joshua Russell. Although the Petitioner never played the 9-1-1 call at the post-conviction hearing and never made it an exhibit to the hearing, he nevertheless asserts that during this 9-1-1 call, someone, who identified himself as "Josh," stated that he had not witnessed the crime and did not see the person who had shot the victim but had heard a gunshot and had seen that the victim had been shot in the chest. The Petitioner claims, without any supporting proof, that Joshua Russell was the person who identified himself as "Josh" on the 9-1-1 call and that Russell's alleged statements on the 9-1-1 call were at odds with Russell's testimony at trial, when he said that the appearance of the person he had seen running from the scene was consistent with the Petitioner. The Petitioner insists that the 9-1-1 call "was highly relevant" to impeach Russell's tentative identification of him at trial because this 9-1-1 call occurred before Stacy Pruett and William Peete began bribing witnesses to make false accounts regarding the incident. Initially, because the Petitioner failed to play the 9-1-1 call at the post-conviction hearing, failed to make it an exhibit, and failed to present testimony from Joshua Russell, we are precluded from speculating about what this evidence would have shown if introduced. See id. In any case, the Petitioner has failed to show that the person who identified himself as "Josh" on the 9-1-1 tape was actually Joshua Russell. For these reasons, we conclude that the Petitioner has not shown that trial counsel was deficient in failing to play the 9-1-1 call at trial for the purpose of impeaching Joshua Russell.

Third, the Petitioner argues that trial counsel failed to impeach Joshua Russell with testimony from Vita Zelikov, who interviewed Russell prior to trial. He asserts that Russell

- 23 -

testified at trial that the Petitioner had told him he needed an easy way to obtain money and that he had seen the Petitioner with a .40 caliber pistol, but Russell never mentioned these things during his interview with Zelikov. The Petitioner argues that trial counsel should have impeached Russell with testimony from Zelikov, who could have established a motive for Russell to lie about his identification of the Petitioner. Again, because the Petitioner failed to present the testimony of Zelikov at the post-conviction hearing, we cannot speculate on what Zelikov's testimony might have been if introduced. See id. Accordingly, we conclude that the Petitioner has not established that trial counsel was deficient in failing to impeach Russell with Zelikov's testimony at trial.

Fourth, the Petitioner asserts that trial counsel failed to impeach Joshua Russell with the Petitioner's cell phone records. He asserts that his phone records establish that Joshua Russell called the Petitioner four times but Russell was unable to reach him and that Russell only called the Petitioner in an attempt to develop him as a suspect. However, Russell testified at trial that the Petitioner was the one who called him while Russell was in the backseat of a police car. The Petitioner claims that his phone records prove that Russell fabricated his trial testimony in order to cover up for William Peete and Stacy Pruett. Here, the Petitioner has failed to show how trial counsel could have used the Petitioner's cell phone records to impeach Russell or how this impeachment would have impacted the outcome of his trial. Therefore, the Petitioner has not shown that trial counsel's failure to impeach Joshua Russell with these phone record was deficient.

Fifth, the Petitioner argues that trial counsel failed to impeach Benjamin Sykes with the Petitioner's cell phone records. He again claims that these records show that the only two people who called and spoke to the Petitioner following the crime were Bernard Martin and Darrius Bell, which was at odds with Sykes's testimony that the Petitioner admitted he thought he had shot someone. Once again, we note that in light of the numerous phone calls made to and from the Petitioner's cell phone shortly after the shooting, the Petitioner has not shown that trial counsel's failure to impeach Benjamin Sykes with these phone records was deficient.

Sixth, the Petitioner contends that trial counsel failed to impeach Tiffany Benson with his cell phone records. He asserts that Benson testified at trial that she awoke at 3:00 a.m. on May 8, 2009, and witnessed the Petitioner talking on his phone to a woman, who was crying, and that immediately after this phone conversation, the Petitioner made admissions to Benson about his involvement in the crime. He further asserts that Benson testified that the Petitioner was in her bed at 7:00 a.m. on May 8, 2009. However, the Petitioner claims his phone records show that he made no outgoing calls on his cell phone from 11:25 p.m. on May 7, 2009, to 7:18 a.m. on May 8, 2009, and that every incoming phone call to his cell phone during this period went unanswered. The Petitioner also maintains that these phone records also show that Benson called his cell phone at 6:49 a.m.

on May 8, 2009. We conclude that the most significant part of Benson's testimony was her statement that the Petitioner admitted that he was involved in the shooting, something that the timing of phone calls would do nothing to diminish. Accordingly, we conclude that the Petitioner has not shown that trial counsel's failure to impeach Benson with his phone records was deficient.

Seventh, the Petitioner argues that trial counsel failed to impeach William Peete with Detective Mark Miller's police supplement, which memorialized William Peete's oral statement at the crime scene that was inconsistent with Peete's testimony at trial that the Petitioner was the shooter. Once again, we conclude that Detective Miller's supplement did not have any significant exculpatory value and that trial counsel exhaustively impeached William Peete on the basis that his written statements to police were inconsistent with his trial testimony. As a result, the Petitioner has not shown that trial counsel's failure to impeach William Peete with Detective Miller's supplement was deficient.

**Failure to Object and Request Mistrial for State's Improper Closing Arguments.** The Petitioner maintains that trial counsel was ineffective in failing to object and request a mistrial when the State committed several instances of prosecutorial misconduct during its rebuttal closing argument. As for this claim, the post-conviction court held, in relevant part, as follows:

> The court finds [P]etitioner failed to present any proof in support of [ineffective counsel based on failure to object] or demonstrate any prejudice; thus, he is not entitled to relief on this issue. Moreover, this court does not find the State's closing argument was improper. Even if the court were to find something improper in the State's closing arguments, the court finds any failure on the part of counsel to object did not prejudice [P]etitioner and he has failed to demonstrate that but for counsel's inaction the jury in his case may have returned a different verdict. The specific allegation of improper argument [is] more fully discussed in the section of this court's order discussing prosecutorial misconduct.
>
> . . . .
>
> The [P]etitioner asserts the prosecutor inappropriately appealed to the jury's emotions when she stated that the "defendant is desperate in wanting the truth and he'll get the truth, ladies and gentlem[e]n, in this court from you. [The victim] wanted to live and wanted to see his parents [and wanted to] have a chance to raise a child. He didn't get his wish." These statements were made in the context of the prosecution arguing that the [Petitioner]'s

jail calls showed his desperation in trying to get Benson to change her testimony and to give him confirmation that she would consent to his demands. The court finds that portion of the argument is neither objectionable; or, improper. The second portion which speaks to the desire of the victim, the court finds is more problematic. However, even if improper, employing the analysis outlined above, the court does [not] find that [the] prosecutor[']s statements rose to the level that they impacted the verdict of the jury to the detriment of [P]etitioner. The statements were made as part of the broader point being addressed in the first portion of this section of the prosecutor's arguments; were not overly lengthy; and, when viewed in the context of the entire argument and all the proof in the case, were not particularly inflammatory. Thus, this court finds [P]etitioner is not entitled to relief based upon this claim.

. . . .

The court finds the prosecutors remarks [about the Petitioner's statements in his pleading being a "confession"] related to the testimony linking [P]etitioner's pro se pleadings to the letters he wrote to Tiffany Benson. The argument of the prosecution was essentially that the [P]etitioner's actions after the offense were strong evidence of his guilt and assertions that the [P]etitioner himself provided the most damning evidence of guilt[] through his post-offense actions. This court does not find in this unique context that the prosecutor's argument amounted to misconduct. Moreover, even if the court were to find the argument improper, because as the court explains above the statements were made against the unique background of [P]etitioner's repeated communications attempting to influence witness[es]; because the court gave an appropriate instruction relating to how the jury should evaluate [P]etitioner's inculpatory admissions; and, because the court finds the proof of guilt in this case was strong, the court does not[,] even if error[, conclude that] the statements of the prosecutor were so inflammatory or prejudicial as to render [P]etitioner's trial unfair. Thus, he is not entitled to relief on the basis of this claim.

The Petitioner argues herein that trial counsel was ineffective in failing to object to three distinct acts of misconduct engaged in by the State when it made the following statements during its rebuttal closing argument:

(1) "You've got a gun pointed at you when you know someone has been doing some drugs, told you he was already going to rob somebody, he points it at you and tells you to get the F out of [the] way. That going to scare you?

Let's say for a minute it didn't. But [William] Peete told you it did. He backed up, a decision I submit he will second-guess and think twice about for the rest of his life. But he backed up and got out of the way."

(2) "[William] Peete heard the desperation in [the victim]'s voice as [the victim] fought for his life on May 7th [sic], 2009. And I submit it compares nothing, nothing to the desperation, if any, that you hear in the defendant's voice on those jail phone calls. But the defendant is desperate and wanting the truth and he'll get the truth, ladies and gentleman, in this court from you. [The victim] wanted to live, wanted to see his parents, [wanted to] have a chance to raise a child. He didn't get his wish."

(3) "And ladies and gentlemen, you can look at all these letters [to Tiffany Benson]. You have Exhibit No. 61[, the pro se Motion to Suppress False Affidavit]. It's a handwritten pleading, letter they received through the Clerk's Office for this defendant's case. It says comes now the defendant Casey Colbert and has his booking number. And when you get to the back, it says he certifies under penalty of law and it's got his name. And you know it's his [pleading] and you know it's his writing because you can tell when you compare it to the letters.

But if you look at the second page [of this pleading], ladies and gentlemen, and you can look at the whole thing, you notice a couple of things. The meat, cheese and bread. He dots his I's with bubbles. When he writes no one, he doesn't write no one spelled out, O-N-E. He spells no number one. And where it says no one identified him as [the perpetrator], ladies and gentlemen, it really started by saying no one identified ["]me.["] And you can look and he crossed out and wrote ["]him.["] And it's not the only place he did it. It's all throughout."

The Petitioner argues comment one was improper because the State "appealed to the fears of the jury by dramatically rephrasing the evidence and making the jur[ors] put themselves in harm's way;" comment two was improper because it "went outside the proof of the homicide to improperly discuss the wants of the victim for the sole purpose of obtaining an emotional response" and constituted a "thinly veiled appeal to vengeance emotion;" and comment three was improper because it mischaracterized the "hand writing exemplar" from his pro se Motion to Suppress False Affidavit as a "confession" or "admission" to the crimes.

Our review of the record shows that the Petitioner never asked trial counsel about his failure to object or request a mistrial in response to each of the State's aforementioned

arguments during closing. Other than making a general claim that trial counsel should have objected to the State's suggestion during closing argument that the pro se motion was "a quasi-admission" by the Petitioner, the Petitioner presented no evidence, through his own testimony or through the testimony of any other witness, to show that trial counsel's failure to object and request a mistrial in response to the State's referenced arguments was ineffective. In its order denying relief, the post-conviction court found that the Petitioner had "failed to present any proof in support of this allegation or demonstrate any prejudice; thus, he is not entitled to relief on this issue." Because the Petitioner has not shown that trial counsel's failure to object and request a mistrial in response to the State's arguments was deficient, he is not entitled to relief.

As part of his stand-alone corresponding deprivation of due process claims alleging prosecutorial misconduct and a violation of his right to a fair trial, the Petitioner asserts that he is entitled to plain error and cumulative error relief because the State committed prosecutorial misconduct by making the previously referenced comments during its closing argument. In light of the overwhelming evidence of the Petitioner's guilt, we agree with the post-conviction court's conclusion that even if one or more of these comments were improper, they "were not so prejudicial that they would warrant the granting of a new trial in this case." See State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (stating that this court must consider the following factors in determining whether the prosecutor's argument affected the verdict to the prejudice of the defendant: "(1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case"). Because the Petitioner has failed to show that the State's comments during closing argument deprived him of his right to a fair trial, he is not entitled to relief on this claim.

**Failure to Object to Improper Leading Questioning.** The Petitioner argues that trial counsel was ineffective in failing to object and request a mistrial when the State asked Tiffany Benson leading questions on direct examination. See Tenn. R. Evid. 611(c)(1). He claims that because trial counsel allowed the State to ask Benson leading questions fifty-four times during testimony without objecting, trial counsel essentially allowed the State to testify for Benson. He also asserts that Benson was not declared a hostile witness and did not demonstrate a lack of memory, which would have justified the State's use of leading questions to develop her testimony. The Petitioner acknowledges that his post-conviction counsel failed to argue this issue at the post-conviction hearing; however, he states that he included this issue in his original post-conviction petition [section 10] and asks this court to consider this issue under plain error review. At the post-conviction hearing, the Petitioner never identified any leading questions to Benson in the trial transcript, never asked trial counsel any questions about his failure to object to such leading

- 28 -

questions, and never provided any testimony showing that trial counsel's inaction was ineffective. In its order denying relief, the post-conviction court found that the Petitioner "failed to present any proof in support of this allegation or demonstrate any prejudice; thus, he is not entitled to relief on this issue." In addition, the court did "not find the State improperly led the witness[]." Here, the Petitioner has failed to provide any proof that the State asked Benson any leading questions, much less that trial counsel's failure to object to these allegedly leading questions was ineffective. Accordingly, the Petitioner has not demonstrated that trial counsel's failure to object and request a mistrial in response to the State's questioning of Benson was deficient.

Once again, as part of his stand-alone corresponding deprivation of due process claim alleging prosecutorial misconduct and a violation of his right to a fair trial, the Petitioner asserts that he is entitled to plain error and cumulative error relief because the State asked leading questions of Tiffany Benson. Because the Petitioner failed to present any evidence of any improper questioning of Benson, he also failed to establish that any such questioning affected his trial, especially in light of the overwhelming evidence of his guilt presented by the State. Accordingly, the Petitioner has failed to show that the State's questioning of Benson deprived him of his right to a fair trial.

**II. Cumulative Error.** The Petitioner additionally claims that he is entitled to post-conviction relief based on the cumulative effect of trial counsel's errors. In particular, he asks this court "to look at the cumulative impact of all the errors committed when assessing the prejudice prong of Strickland." The State responds that because the Petitioner failed to establish that trial counsel was deficient in multiple respects or that he was prejudiced by any of the issues raised in this brief, the cumulative error does not apply. We agree with the State. The cumulative error doctrine "is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77. Given that the Petitioner established just a single instance of trial counsel's deficient performance, there is no need for this court to consider the aggregate prejudicial effect of trial counsel's conduct. The Petitioner also argues that the cumulative effect of his allegations of prosecutorial misconduct deprived him of a fair trial. Because the single instance of the State's failure to comply with Rule 12.1 did not deprive the Petitioner of his right to a fair trial, there is no cumulative effect to consider.

## **CONCLUSION**

Because the Petitioner has failed to establish that he received ineffective assistance of counsel or that the State committed prosecutorial misconduct depriving him of his right to a fair trial, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE